Dickson L. **HENDLEY** and Ryan D. **Hendley**, as Shareholders and Directors of I.H. Services, Inc., of North Carolina, and I.H. Services, Inc. of North Carolina, Plaintiffs,

v.

Terry L. **LEE**, Defendant.

Civ. A. No. 87–656–17.

United States District Court, D. South Carolina, Greenville Division.

Nov. 13, 1987.

---

Carl G. Ferguson, Gwendolyn G. Embler, Leatherwood, Walker, Todd & Mann, Greenville, S.C., for plaintiffs.

Cecil H. Nelson, Wilkins, Wilkins, Nelson & Kittredge, Greenville, S.C., and R. Walton McNairy, McNairy, Clifford, Clendenin & Parks, Greensboro, N.C., for defendant.

JOSEPH FLETCHER ANDERSON, Jr., District Judge.

This is an action brought pursuant to *S.C. Code Ann.* § 33–21–150, *et seq.*, (1976, as amended), seeking judicial intervention in the affairs of a deadlocked corporation. Plaintiffs, Dixon L. Hendley and Ryan D. Hendley, (the Hendleys) and defendant, Terry L. Lee (Lee) constitute the shareholders of a corporation organized and existing under the laws of South Carolina, known as I.H. Services, Inc. of North Carolina (the North Carolina corporation). Upon motion of the defendant, the North Carolina corporation was added as a nominal party to this action after the litigation was commenced. *See* order dated May 4, 1987.[1]

Section 33–21–150 authorizes a court to dissolve and liquidate the assets of a corporation when it is established that:

(1) The directors of the corporation are so divided respecting the management of the corporation's business and affairs that the votes required by the board of directors cannot be obtained and the shareholders are unable to terminate the division, with the consequence that (A) the corporation is suffering or will suffer irreparable injury, or (B) the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally; ... [or]

(2) The shareholders are so divided respecting the management of the business and affairs of the corporation that (A) the corporation is suffering or will suffer irreparable injury, or (B) the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders....

*S.C. Code Ann.* § 33–21–150(a)(1)–(2).

In addition to allowing an order of forced dissolution, the statute empowers a court to grant other relief, including ordering the purchase of the shares of any shareholder, either by the corporation or by other shareholders. § 33–21–155(a)(4). Actions arising under the statute are proceedings in equity. *Ward v. Ward Farms, Inc.*, 283 S.C. 568, 324 S.E.2d 63 (1984).

The pretrial skirmishes in this proceeding are notable because of the fact that both sides have changed their respective positions on several occasions. The Hendleys originally sought an order setting the fair market value of the company's stock and compelling Lee to sell his shares in the company to them or, in the alternative, an order for a liquidation and dissolution of the company. In his original answer, Lee, while agreeing the corporation was hopelessly deadlocked, indicated his desire to purchase the shares in the corporation owned by the plaintiffs. Both sides thereafter completely reversed their positions, with the plaintiffs seeking to require Lee to purchase their interest in the company, and Lee seeking to force the plaintiffs to buy him out.

The court permitted both sides to amend their pleadings accordingly, but admonished all parties that, regardless of the positions taken in the pleadings, the court was specifically retaining the right to grant the relief it determined to be most appropriate, including a possible dissolution of the company.

By the time of the final hearing, plaintiffs had once again modified their position, insisting that the most appropriate form of relief would be an equitable division of the corporate assets. Unlike a corporate *dissolution*, which involves a liquidation of assets and winding up of the business, the plaintiff's proposal involved an even *division* of assets and customer contracts, so that both plaintiffs and defendant may continue to operate in North Carolina.

At the court's suggestion and by agreement of the parties, the trial on the merits was bifurcated and a hearing on the value of the stock was held on May 20, 1987. Since at that time neither side wanted to sell their stock, it was thought that one party or the other possibly would become willing to sell once the value of the North

---

1. Although the May 4 order does not designate in what capacity the corporation is to be joined, the court has determined the most appropriate designation is that of a co-plaintiff, inasmuch as the corporation is more closely aligned with the plaintiff. Henceforth, all pleadings in this action shall designate the corporation as a party plaintiff.

Carolina corporation was established. However, after hearing the valuation evidence, the court concluded the question of valuation was inextricably entwined with the issue of who ultimately should be required to buy or sell. The question of valuation was therefore postponed, with that decision to be made in conjunction with the decision on the merits.

In early August, the court was advised by counsel for the parties that both sides wanted to go forward with the trial as soon as possible and therefore only limited discovery was conducted. The court reconvened on August 20, 1987, at which time the parties presented evidence on the ultimate issue of what relief should be granted and issues related thereto. This court issued an order dated October 5, 1987, requiring plaintiffs to buy defendant's stock at a fair price. Both parties thereafter asked the court to amend its order and clarify certain matters, and defendant sought a partial new trial on the issue of valuation. A hearing was held on October 23, 1987, to allow the parties to address these additional concerns.

As a result of these motions, the court will supplement and amend its earlier order. Therefore, the order of October 5, 1987 is hereby vacated and this order is to be substituted therefor.

After hearing and receiving the evidence, reviewing the exhibits and briefs of counsel, and studying the applicable law, this court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the *Federal Rules of Civil Procedure.* To the extent any findings of fact constitute conclusions of law, they are adopted as such; to the extent any conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

1. The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of ten thousand and no/100 ($10,000.00) dollars, and this court has jurisdiction of the parties and subject matter of this action.

2. The North Carolina corporation is presently authorized to transact business in North Carolina and Virginia. The company in fact transacts business in those two states.

3. The North Carolina corporation was organized on September 11, 1981. The original issuance of shares of the Company was as follows: 800 shares (80%) to I.H. Services, Inc., a South Carolina corporation (the South Carolina corporation); and 200 shares (20%) to the defendant, Terry L. Lee. The South Carolina corporation is not a party to this litigation.

4. On October 14, 1982, the South Carolina corporation transferred its 800 shares of the company as follows: 450 shares to plaintiff Dickson L. Hendley (Dick Hendley); 300 shares to Joel W. Wells (who is not a party); and 50 shares to Lee. Thus, immediately after these transfers Lee held 250 shares (25%) of the company, Dick Hendley owned 450 shares (45%) and Wells 300 shares (30%).

5. Lee was given the twenty (20%) percent ownership up front at the time of incorporation. Under his employment agreement, Lee was given the option to purchase an additional five (5%) percent of the stock at a specified price when the gross billings of the North Carolina corporation reached $3,000,000.00. However, Lee was instead given this additional five (5%) percent on October 14, 1982, by Dick Hendley and Wells, the owners of the South Carolina corporation.

6. As a result of disputes between Wells and Lee, as will later be discussed, Wells severed all ties with the North Carolina corporation in mid–1985. On June 27, 1985, the North Carolina corporation redeemed Wells' 300 shares for $180,000.00, which represented thirty (30%) percent of the value all three stockholders had placed on the North Carolina corporation for purposes of a voluntary sale of stock by any one of them. Subsequent to the redemption, Lee held 250 of 700 then outstanding shares, or approximately 36% of the outstanding shares. Immediately subsequent to the redemption, Dick Hendley's 450 shares represented approximately sixty

four (64%) percent of the outstanding shares.

7. On November 19, 1986, Dick Hendley sold Lee 100 additional shares, bringing Lee's ownership to 350 of the 700 outstanding shares, or 50%. This sale of stock was made for $12,000.00 in cash with $48,000.00 secured by a promissory note. Dick Hendley contemporaneously gave 35 shares, representing five (5%) percent of the outstanding stock, to his son Ryan D. Hendley. Thus, immediately subsequent to these transfers, and at present, the Hendleys together own fifty (50%) percent of the company's outstanding shares and Lee owns fifty (50%) percent of the company's outstanding shares.

8. At that time, the North Carolina corporation (then using a different name) was an affiliate of the South Carolina corporation. As noted above, the corporation was organized under the laws of South Carolina, but engages in business within the state of North Carolina and to a minor extent within the state of Virginia. The South Carolina corporation has engaged in business in portions of North Carolina, all of South Carolina, and in other areas. The two companies have a boundary line agreement delineating certain exclusive territory and certain common territory.

9. The North Carolina corporation was organized as a subsidiary of the South Carolina corporation to perform janitorial and maintenance services in North Carolina, and the two companies now provide identical services to their respective customers but with some differences in management style. Upon organization of the corporation Lee was employed as general manager, and an employment agreement was entered into at that time. Lee continued as general manager at all times thereafter, and the employment agreement was amended in 1982 and 1985. Lee is now president; Lee and the Hendleys comprise the three-man board of directors.

10. The South Carolina corporation is owned sixty (60%) percent by Dick Hendley and forty (40%) percent by Joel Wells. Defendant Lee has no ownership interest in the South Carolina company and does not participate in any profits from, or growth of, that company. Likewise Joel Wells does not participate in the profits or growth of the North Carolina corporation involved in this suit. The Hendleys are a common denominator between the two companies, Dick L. Hendley being the original founder of the South Carolina company in 1952.

11. By November, 1986, the North Carolina corporation had grown to the point that it was economically feasible for it to operate autonomously with a complete staff. Instead of the South Carolina corporation providing its administrative services, as it had originally, those functions were then transferred. After a degree of difficulty, the corporate records were all moved from Greenville, South Carolina to Greensboro, North Carolina between October and December of 1986.

The comptroller of the South Carolina corporation was in charge of transferring the financial records to North Carolina. Subsequent to the institution of this action, he has been fired and has admitted embezzling large sums from both companies. The extent of his embezzlement from the corporations has not yet been finally determined, but an audit is now in progress and it appears that the embezzlement may be as much as twenty two thousand and no/100 ($22,000) dollars. Additionally, the same employee was responsible for filing certain tax records and deposits with the federal government. His failure to properly file these documents caused the North Carolina corporation to incur approximately fifty thousand and no/100 ($50,000) dollars in tax penalties. Testimony at the trial indicated that most, if not all, of these penalties have been refunded by the federal government. There has not yet been a recovery of the embezzled funds, although Dick Hendley indicated at trial a full reimbursement of these funds would be made by the South Carolina corporation or by him personally. The evidence regarding the embezzlement and tax errors is speculative at this point, thus those events and figures have not been taken into account in the evaluation process.

12. Dick Hendley's background, experience, know-how, reputation, and contacts in the industry were instrumental in the initial success of the North Carolina corporation. Additionally, Joel Wells provided a great deal of support to the North Carolina corporation, particularly during the first year of its operations, when he made numerous calls on potential accounts with Terry Lee.

13. Terry Lee's managerial abilities were highly rated by all witnesses in this case. There is no issue of mismanagement or disloyalty on his part and all parties acknowledge that he has done an excellent job as Chief Executive Officer for the corporation. The plaintiffs and several of their witnesses complimented Lee's business abilities and judgment, and the growth and profitability of the corporation under his control have been remarkable.

14. The corporation is a service business providing housekeeping and maintenance service to industrial plants and has about thirty two (32) contracts with various customers. The company employs approximately 520 people and provides services primarily in the textile industry although its customer base is diversified as to its location and includes some non-textile plants. The assets of the company are not generally considered marketable and consist of the headquarters equipment in Greensboro, the equipment used to service the contracts at the various locations, cash and accounts receivable, and the customer contracts. The corporation has no real estate and has no investment properties, all of its assets being related to its maintenance operations.

15. The economic outlook of the company is extremely good. The company has a history of prosperity even during times of economic depression in the textile industry. Its largest customer, Burlington Industries, Inc., is undergoing a corporate reorganization which may influence the operations or profitability of the company, but that influence could either be positive or negative and cannot be predicted with certainty at this time.

16. The corporation is an exceptionally well run, profitable company. The corporation operates on a fiscal year ending October 31 of each year. Each fiscal year has shown a steady growth in profitability from a small loss in the first year of operation to pretax profits as follows:

| | |
|---|---|
| 1983 | $134,619 |
| 1984 | $104,049 |
| 1985 | $209,313 |
| 1986 | $203,971 |

17. The growth and profitability of this corporation are further reflected in the gross revenues from sales which are as follows:

| | |
|---|---|
| 1982 | $ 223,681 |
| 1983 | $1,550,357 |
| 1984 | $1,704,891 |
| 1985 | $2,718,641 |
| 1986 | $4,202,043 |

18. The policy of the corporation over the years has been to declare and pay substantial bonuses and salaries to the owners of the company at or near the end of each fiscal year, thereby reducing the various tax burdens to the company. The combined compensation paid to plaintiffs and defendant is as follows:

| | |
|---|---|
| 1982 | $ 50,936 |
| 1983 | $144,000 |
| 1984 | $195,000 |
| 1985 | $249,559 |
| 1986 | $348,744 |

19. The continued excellent growth pattern for the corporation has continued through the first six (6) months of fiscal year 1987. During the six (6) month period ending April 30, 1987, the company had gross income of $2,354,246 and a net income of $312,287. May, June and July were even more profitable.

20. The corporate assets are comprised primarily of cash on hand now approaching $400,000, accounts receivable in the amount of $496,600 as of April 30, 1987, and fixed assets with a depreciated value of $185,753. The company has an outstanding record of collection of accounts receivable. The cus-

tomers of the corporation are for the most part large textile corporations. Past history indicates that accounts receivable are paid in a timely fashion within 22–25 days of billing. The corporation is debt free, current on all of its payables, and anticipates no extraordinary losses in the future. It is not subject to any lawsuit or claim which would affect the financial well being of the corporation.

21. All of the above figures indicate that the corporation has grown rapidly due to the stability of its existing contracts and the aggressive manner in which new contracts have been solicited. The history of the corporation is mirrored by recent events which indicate a continued upswing in the company's level of business. The capital structure of the corporation is sound as indicated by the financial statements, and the company's dividend capacity is sound as indicated by the bonuses paid to the shareholders which have steadily increased.

22. The prospects for the future of the corporation are excellent. The company is well managed, has employed qualified middle management, has developed a computer system which should serve well into the future and has a physical location customized for its use. The corporation can handle substantially more business with very little additional expense and very little management or asset expansion.

23. Differences in managerial style and personality led to problems during the period of time Lee was supposed to report to Joel Wells. In those instances, Mr. Hendley would be required to intervene as the "peacemaker" and ultimately, the judge. Eventually, as indicated, Wells severed all ties with the North Carolina corporation as a result of those continuing disputes.

24. Subsequent to the departure of Wells in June 1985 until early in 1986, the North Carolina corporation ran fairly smoothly and there was very little friction between its owners, Lee and Dick Hendley. However, in the latter part of January or early February, 1986, certain disputes arose and persisted between the parties which culminated in this litigation. There was dissatisfaction, on both sides, over the way the administrative responsibilities were being transferred from Greenville to Greensboro. There was disagreement over certain provisions of Lee's employment contract with the corporation. There were general disagreements regarding managerial styles. The Hendleys were greatly offended when Lee secretly taped one of their meetings. Both sides have expended a great deal of energy in seeking to blame the other for the breakup of an obviously successful business enterprise. Under generally established equitable principles, fault is a factor to be considered by a court in fashioning equitable relief under the statute, but in the case at bar, the court finds as a fact that both sides contributed equally to the disharmony which precipitated this litigation.

25. In the present action, the parties agree they are deadlocked as contemplated by the statute. Corporate deadlock, under statutes similar to the South Carolina statute, has been defined as "a decision or indecision of stockholders, which results in the corporation's inability to perform its corporate powers ... [or] a state of inaction or neutralization caused by the opposition of persons or of factions." *Callier v. Callier*, 61 Ill.App.3d 1011, 18 Ill. Dec. 941, 944, 378 N.E.2d 405, 408 (1978). Although there was little, if any, testimony showing that the corporation is unable to perform its corporate powers, it is entirely likely that such a state of affairs would have arisen had not this court enjoined directors and stockholders meetings which had been scheduled. It is clear the dislike the parties hold for each other has divided the management of the corporation and that the corporation may suffer irreparable injury in the form of lost customers if the present situation continues.

26. Having found the corporation is deadlocked, as contemplated by the statute, the court now turns to the potential remedies available. In light of the broad and liberal South Carolina statutes and the status of the pleadings, the court has numerous alternatives available to it for equitable consideration, including those requested by

the plaintiffs and the defendant on various occasions. Once the plaintiff shows the statute is applicable through sufficient allegations, the inquiry becomes "essentially one for resolution through the familiar balancing process and flexible remedial resources of courts of equity." *Meiselman v. Meiselman*, 309 N.C. 279, 307 S.E.2d 551, 562 (1983).

■ 27. Although this action was brought pursuant to the corporate dissolution statute, neither party actually seriously argued dissolution was proper in this case. Because § 33–21–150 is jurisdictional, asking for dissolution is merely a prerequisite to obtaining other forms of relief under § 33–21–155. Dissolution of the entire North Carolina corporation would clearly be improper in this instance, due to the continued profitability and growth potential of the business and the investments of time and money by the parties involved in the business as previously stated. The dissolution of a profitable enterprise is a drastic measure, although this court cannot alone consider the monetary success of the business when deciding whether to order it dissolved. *S.C.Code Ann.* § 33–21–150(f). Consideration of the stockholders' best interests is, however, the most relevant factor in this type proceeding, and that interest is "reflected to a large degree in the profitability of the corporation." *Gillingham v. Swan Falls Land & Cattle Co.*, 106 Idaho 859, 683 P.2d 895, 898 (App. 1984). See also *Fox v. 7L Bar Ranch Co.*, 198 Mont. 201, 645 P.2d 929 (1982) (In fashioning an appropriate remedy, the court should consider benefit or detriment to shareholders).

■ 28. As stated earlier, plaintiffs proposed a division of the corporation, to be accomplished by dividing the thirty two accounts presently being served by the North Carolina corporation along geographical lines,[2] with thirteen of these accounts being assigned to the Hendleys and the remainder being given to Lee. The proposal further calls for an equitable divi-

sion of all tangible assets, and a two year moratorium on competing for the existing thirty-two customers.

Based upon the weekly billing reports for the weeks of November 6, 1986 through August 6, 1987 (excluding the week of July 2, 1987, which report was not furnished), the division of assets plan would result in the following economic division of the accounts: the Hendleys would get accounts averaging 50.6% of the total billings and 49.9% of the gross profits of the North Carolina corporation. Lee would receive accounts representing 49.4% of the total billings and 50.1% of the gross profits of the North Carolina corporation.

The concept of some fair division of existing accounts and corporate assets was first suggested by the court[3] and was explored at length at the hearing. It is obvious that plaintiffs have made a sincere effort to structure an equitable division plan that is fair to both sides. Nevertheless, the court declines to adopt this remedy for the following reasons:

(a) If a division was ordered, the court would be called upon to decide many collateral issues such as continued use of the corporate name, as well as the appropriate division of office furniture and equipment, motor vehicles, and computer systems. In all probability, the court would be required to appoint a receiver or special master, and further disagreements would likely result;

(b) Issues of contract assignability would have to be resolved;

(c) Creditor claims would have to be paid and distribution of dividends decided;

(d) Future tax liabilities and expenses would have to be addressed; and

(e) Although the new companies would be temporarily prevented from attempting to lure away the other's existing customers, all new customers would be fair game for either company. Given the intense dislike the parties have for each other, it is entirely possible a division of customer accounts would generate continued animosity and additional litigation.

---

**2.** The proposal would use Interstate Highway 77 as the approximate dividing line.

**3.** *See* transcript of May 20, 1987 hearing.

(29) Having rejected dissolution of the corporation or a division of accounts and assets as potential remedies, the only remaining alternative is that of a forced buy out by either the Hendleys or defendant. In that regard, the court finds as follows:

(a) The relative financial positions favor a purchase by the Hendleys over a purchase by Lee. Personal financial statements were submitted by all of the parties and the Hendleys have much greater financial strength than does Lee, the Hendleys together being worth approximately ten times as much as Lee. To require Lee to purchase the Hendley stock would require him to commit several times his net worth, while to require the Hendleys to purchase the Lee stock would require them to commit approximately twenty five (25%) percent of their net worth.

(b) If the Hendleys purchase the entire company and continue to operate in North Carolina, they will be protected by a two year covenant not to compete which is incorporated into Lee's employment contract and modified by the court in the following manner. The court has the authority to expand Lee's covenant under § 33–21–155(a)(2), which allows the court to alter "any resolution or other act of the corporation." *Id.* The present employment contract between Lee and the corporation imposes a covenant the terms of which depend on the circumstances surrounding Lee's departure from the corporation. If Lee voluntarily leaves, he cannot compete in any county in which the North Carolina corporation is servicing customers at the time he terminates employment. If Lee leaves the business for any other reason, he cannot compete with the company for the business of any existing customer at the time of termination. The court recognizes the need to protect both the Hend-

leys' sizable investment and the others who have some interest in the corporation by restricting Lee's activities after the sale takes place. Therefore, the covenant which currently binds Lee will be expanded, and regardless of the nature of Lee's departure, he cannot compete in a janatorial service business in any county west of a boundary comprised of and including the following counties: Granville, Durham, Chatham, Moore and Richmond for a period of two years following his departure. The court specifically finds this modified covenant to be reasonable, properly limited in scope and time, and not against public policy; therefore, it is binding upon Lee. See *A.E.P. Industries, Inc. v. McClure*, 308 N.C. 393, 302 S.E.2d 754 (1983). The Hendleys are under no such contractual obligation not to compete with Lee in North Carolina. Given their resources, their business acumen and their demonstrated ability to work hard and establish a successful, competitive business in a relatively short time, the possibilities for future competition with Lee in North Carolina cannot be ignored. Such action could lead to continued conflict between the parties and, quite possibly, additional litigation.

The Hendleys have pointed out that this court, sitting as a court of equity, has the inherent authority to impose a covenant not to compete running against them.[4] In fact, they have offered not to compete with Lee for his *existing* customers if their equitable division proposal is adopted. While it is true that this court has what has been referred to as "plenary power" to protect the rights of a complaining shareholder under the statute, it is not necessary to exercise that power to fashion a court-ordered covenant not to compete when the parties, by contract, have already agreed upon one which can be easily expanded. Moreover, the proposal by the Hendleys that they not compete for *current* accounts

---

4. Plaintiffs' position on the ability of the court to impose a covenant on the parties has also changed during the course of this litigation. *Compare* plaintiffs' Memorandum of Law dated May 27, 1987 ["this court does not have the authority to enjoin the plaintiffs, either directly or indirectly, from competing with I.H. Services of North Carolina in the event that ... Lee is ordered to purchase the plaintiffs' stock."] *with* plaintiffs' Memorandum of Law dated August 28, 1987 ["The court is fully empowered to include a reasonable 'covenant not to compete' in its order so as to ensure that the court's remedy is fair and equitable to both parties, by virtue of § 33–21–155."]

is not as broad as the covenant which is now imposed upon Lee, and such a prohibition would not guarantee an end to all disputes between the litigants.

Covenants not to compete are not favored in South Carolina, *Oxman v. Profitt,* 241 S.C. 28, 126 S.E.2d 852 (1962) or in North Carolina, *Kadis v. Britt,* 224 N.C. 154, 29 S.E.2d 543 (1944). Justice would appear to be better served by modifying and expanding the terms of the one agreed upon by the parties while they were on amicable terms, rather that creating one by judicial fiat.

It is noted that most of the customer contracts, which constitute the principal assets of the company, provide for cancellation upon thirty days notice. It therefore appears that, in addition to imposing a restrictive covenant against Lee, the court should enjoin Lee from taking any action calculated to cause the company to lose existing contracts, or any action which might be detrimental to the continued viability of the company.[5] Section 33–21–155 gives a court power to direct or prohibit any act of the corporation or the shareholders, directors, officers or other parties to the action. This section, therefore, authorizes this court to require Lee's continued cooperation during the transition process.

(c) Somewhat related to the issue of a covenant not to compete, but of substantially less importance, is the fact that, through discovery, the plaintiffs and certain officers of the South Carolina corporation have gained exposure to certain sensitive information about the North Carolina corporation, including the profitability of certain accounts. To prevent the use of that confidential information by the plaintiffs or their business associates if Lee were to purchase would require an extensive restraining order extending beyond the parties to this action. Requiring the Hendleys to purchase would moot the question of unfair competition or the unfair use of confidential information obtained in the course of this litigation.

(d) The Hendleys have submitted on several occasions, and defendant has conceded, that the Hendleys are able to operate the North Carolina corporation. Affidavit of Dick L. Hendley dated April 1, 1987, page 9. No inordinate hardship would be imposed upon the Hendleys by requiring them to purchase, and the purchase by them would diversify and likely make more valuable their other holdings. Dick Hendley is a sixty percent shareholder in the South Carolina corporation. As controlling shareholder he has the ability to utilize the economies of scale which are conducive to success in such an industry through some type of cooperative arrangement or outright merger between the two companies. The South Carolina company has the procedures, the contacts, the organization, the assets and the personnel to run the North Carolina business.

(e) The Hendleys are good, resourceful, hardworking businessmen capable of managing the North Carolina corporation from their South Carolina base. The industry is one with which they are well acquainted, they having been pioneers in this field in the 1950s.

(f) Lee is a highly motivated, extremely competent manager capable of readily adapting to a different vocation. Many of his managerial and administrative skills are transferable to other positions in business.

(g) The tax burden to Lee if he sells his interest is less than the tax burden to the Hendleys if they sell their interest since Lee's basis in his stock is greater.

(h) A sale to the Hendleys would minimize any name confusion between the two companies.

(i) From the tenor of the parties' testimony and affidavits in this case, the court finds that future friction and competition, either direct or indirect, as well as future litigation is likely between the parties if Lee purchases the Hendley interest or in

---

**5.** By including such a prohibition in this order, the court in no way intimates any opinion that Lee is predisposed to harm the corporation upon leaving. Such a prohibition is included out of an abundance of caution, consistent with this court's attempt to prevent further conflict between the parties.

the event of a division of assets. A purchase by the Hendleys is most likely to avoid future dissension between these strong willed individuals.

■ (30) Having determined the Hendleys should be required to purchase Lee's stock, the court must now address the question of valuation. The proper valuation date in this case is the value of the corporation at the time of the August 20 trial. Apparently, there is little case authority setting the proper date of valuing a company in a buy out situation. In cases of minority stockholder oppression, the date of ouster seems appropriately used. Here there is no such event which would give rise to a similarly significant date.

Many states have enacted legislation similar to that in place in South Carolina. Some statutory schemes provide valuation guidelines. For instance, the New Jersey statute expressly authorizes a commencement date valuation "plus or minus any adjustment deemed equitable by the Court", N.J.Stat.Ann. Section 14A:12-7(8)(a) (West 1986 Supp.). The Illinois voluntary dissolution statute (Ill.Rev.Stat. Ch. 32, § 12.55(g)) (Smith–Hurd 1985 Replacement Volume) states that "the Court shall determine the fair value of the shares as of such date as the court finds equitable." Obviously, the ultimate issue is what is fair between the parties in each case. The defendant has suggested that the proper date in this case would be the sales closing date. A closing date valuation is inappropriate, because it would always require the court to speculate on the future performance of the company, unless the sale and hearing dates coincided (a difficult proposition in light of the magnitude of a buy out and the financial complexity of such a transaction).

In this case, evidence was received as to the worth of the company up to August 20, the date of the hearing on the merits (although the bulk of the evidence used was received at the May 20, 1987 hearing). The most equitable valuation date is thus the date of trial. Although the figures for the fiscal year ending October 31, 1986 were used as a foundation for this court's economic findings, additional information was received and utilized so as to reflect the profitability of the corporation in 1987. The testimony of the plaintiffs' expert witness, Dr. Oliver Wood, indicated the value of the company is $1,334,072. The testimony of the defendant's expert witness, Dr. Perry Woodside, originally indicated that the value of the company is $1,730,552. At the subsequent hearing on the merits, Dr. Woodside opined that the company had done even better than expected in the months which intervened between the hearing on valuation and the hearing on the merits. As result, Lee now contends, in post trial submissions to the court, that the fair market value of the company is $1,950,000. Thus, the figure representing the purchase price for Lee's one half interest ranges from a suggested low of $667,036 to a suggested high of $975,000.

The central premise of Dr. Oliver Wood's valuation may be stated briefly. Dr. Wood's valuation of $1,334,072 is arrived at by multiplying "adjusted pretax income" for the most current fiscal year of the company by an "earnings multiplier" of 4.48.

The term "adjusted pretax income" is arrived at by adding to pretax income for the most recent fiscal year of the company ($203,971) all compensation paid to Dick Hendley during that year ($93,813). Dick Hendley's salary is added back to income because Mr. Hendley performed no services for the company during that year; his compensation was more in the nature of a distribution of profits. Dr. Wood described Dick Hendley's salary as "non-functional."

Dr. Wood's "earnings multiplier" is based upon the relationship between adjusted pretax income of the company at the end of 1984 fiscal year and the value placed on the company for that year by Dick Hendley, Terry Lee, and Joel Wells on January 15, 1985. In other words, the $600,000 valuation agreed upon by Dick Hendley, Terry Lee, and Joel Wells at that time was 4.48 times the 1984 fiscal year's adjusted pretax income of $134,049.

Dr. Wood found the 1985 valuation to be significant because it was the last time that the parties themselves focused their atten-

tion on valuing the company. Specifically, Joel Wells, who was having difficulties with Lee at the time, was very careful to arrive at what he felt was a proper valuation. In fact, six months after arriving at the valuation, Wells sold his stock based upon that valuation. There is no reason to doubt that Wells wanted to be paid the fair market value of his stock.

Dr. Wood also found the 1985 valuation to be important because it was the method all of the principals agreed to use to set the value of the company for stock restriction agreement purposes. This agreement set the value in case of a stockholder's attempted sale to a third party, the resignation or retirement of a stockholder, as well as the death, disability, or bankruptcy of a stockholder.

Under Dr. Wood's primary approach, he used the latest accountant's annual financial statement of October 31, 1986, as the foundation. This is significant in that Dr. Wood utilized the best year in the company's history to base its value. This approach thus was not dependent upon forecasting future sales, future expenses, future profits, or the future addition or loss of contracts. Dr. Wood's approach is a capitalization of earnings approach. The defendant's expert, Dr. Perry Woodside, confirmed this to be the case. The value of $1,334,072 may also be called the present value of future earnings. The value of the company's assets essentially stems from its ability to generate these earnings as a return on investment.

Dr. Perry Woodside's valuation of the company is, in concept, not significantly different from the valuation method used by Dr. Oliver Wood. Dr. Woodside used an "earnings multiplier" of 4, rather than 4.48, but more importantly he defined "adjusted pretax income" by adding back to pretax income not only Hendley's nonfunctional salary but also $150,000 of Lee's approximately $250,000 salary. In effect, Dr. Woodside determined that Lee's functional salary for the most recent year was only $100,000 rather than $250,000. By making this adjustment Dr. Woodside came up with a higher adjusted pretax income.

The principal difference between the opinions of the two experts lies in the definition of "adjusted pretax income." Dr. Wood's adjusted pretax income was $297,-784; Dr. Woodside's adjusted pretax income was much higher. The difference is purely a matter of whether any portion, or what portion, of Lee's salary was nonfunctional. Dr. Wood assumed that all of Lee's salary was functional; Dr. Woodside assumed that only $100,000 of Lee's $250,000 salary was functional.

It is difficult to believe that Lee's functional salary, as described by Dr. Woodside, was only $100,000 for the most recent fiscal year. Lee's compensation for 1983 and 1984 was $144,000 and $165,000, respectively. At that time Lee owned only a 25% interest in the company. Lee's salary increased approximately 12% between 1984 and 1985 to $185,809. An additional 12% increase for 1986 would place his salary at approximately $208,000 for the most recent fiscal year. However, since under his direction sales increased from $2,718,641 in 1985 to $4,202,043 in 1986, Mr. Lee was paid $249,993 for that year.

During all of these years the gross receipts, and therefore the profits, of the company were generated principally as a result of Lee's personal efforts and activities, along with the backing and assistance of the South Carolina corporation. It is difficult to consider then that Lee's functional compensation for the most recent fiscal year was not $249,993 but only $100,-000. By even a conservative judgment, Lee's functional compensation would be in the $150,000 to $200,000 range. Indeed, under the compensation plan set for the years 1985 and forward, which as a bottom line still remains in full force and effect today, Lee was guaranteed compensation of $186,250 a year if the pretax earnings of the company were only $289,049. Plaintiffs' Exhibit 2. Further he is guaranteed 65% of any additional monies that are left over after a non-functional payment of $63,750 to Dick Hendley.

Neither expert took into consideration the twenty two thousand and no/100 ($22,-000) dollars in embezzled funds or the fifty

thousand and no/100 ($50,000) dollars in tax refunds, because these facts were not known at the time they made their evaluations. It has been argued that these monies should be added back to the adjusted pretax income for purposes of determining the value of the company. However, as noted above, the amount of the embezzlement has not been finally determined at this time. Moreover, with regard to both the embezzlement and the tax refunds, it is not at all clear from the record whether these monies were embezzled or paid out during the most recent fiscal year or over a period of years. If over a period of years, it would be inappropriate to add the sum total back to the adjusted pretax income for purposes of valuation. Because the record does not reflect the exact amount of the funds, nor the time period during which they were embezzled or paid out, the court is unable to find, with any degree of certainty, that these factors should be taken into account in determining valuation. To include them in the valuation figure would be resorting to speculation and conjecture, and therefore the embezzlement and the tax refunds will be disregarded in determining the valuation of the corporation.

After the original order of this court, the defendant moved for a partial new trial on the issue of valuation under *Fed.R.Civ.P.* 59(a)(2). Defendant argued the figures used by the court were stale, and that because the 1987 fiscal year end figures would reveal a growth in profitability, the court's numbers substantially diminished the price to be paid to the defendant. The court disagrees. A new trial is warranted only if needed to correct manifest errors of law or fact or if newly discovered evidence is presented.[6]

In this case either party could have requested a continuance until the 1987 figures were available. A party cannot obtain a new trial on the ground of newly discovered evidence unless he can show that despite his exercise of due diligence he failed to discover the evidence earlier. *Contempo Metal Furniture Co.*

*v. East Texas Motor Freight Lines,* 661 F.2d 761 (9th Cir.1981). Defendant has not met this burden. It would be error for the court to allow defendant a second chance at valuation, when he knows he is now the selling party. In addition, because the issues are so intertwined, a partial new trial would be impractical and a full trial would have to be conducted.

The court has determined, however, that its earlier order should be modified by adding a two (2%) percent growth factor to the 1986 pretax income, a figure which is consistent with the past figures and with available 1987 financial data. The growth pattern was testified to by all parties at the May hearing and not contested at the August hearing. The increase of the 1986 pretax income by two (2%) percent is fair, especially in light of the length of time which elapsed between the end of fiscal year 1986 (October 31) and the trial on the merits of this case.

After carefully considering the respective positions advanced by the economic experts, and the arguments of the very able attorneys who have appeared in this case, the court finds that an earnings multiplier of 4.48 should be utilized. The parties agreed upon this multiplier while still on amicable terms and without knowledge that subsequent disputes would lead to this litigation. The court finds that $75,000.00 of Mr. Lee's salary should be considered nonfunctional. Applying these figures, the total value of the corporation at the time of the trial (August 20, 1987) is fixed at $1,688,348.12 as follows:

| | | |
|---:|:---|:---|
| 203,971.00 | — | pretax income for most recent fiscal year |
| + 4,079.42 | — | 2% allowance for 1987 growth |
| + 93,813.00 | — | non functional income paid to Dick Hendley |
| + 75,000.00 | — | non functional income paid to Terry Lee |
| 376,863.42 | | |
| × 4.48 | — | earnings multiplier |
| 1,688,348.12 | | |

This figure assumes no "slippage" should the Hendleys acquire complete own-

---

**6.** At the second hearing, Dr. Woodside, defendant's expert, merely stated that the company was "a bit more profitable than we were looking at when I was here last."

ership of the company, and should Lee's apparently valuable relationship with the company end. Wells, who has experience in North Carolina although he is no longer officially associated with the company, testified that the slippage would be in the range of 10% to 30%. It cannot be denied Lee is a "key man" with the company. Lee himself strongly urged that his firing would be detrimental to the continued profitability of the company,[7] and his expert, Dr. Woodside, conceded that there would likely be an erosion in customers, though he felt the erosion might be gradual. Indeed, this concern was of critical importance in this court's decision to enjoin the firing of Lee pending a hearing on the merits of this litigation. *See* Orders dated March 26, 1987 and April 3, 1987.

The Hendleys indicated in their testimony that if they purchased the company, Lee will not be retained as an employee. In the original order, a reasonable "slippage" factor was taken into consideration in determining the fair market value of the company. From all the evidence presented, the court found a slippage figure of 7.5% should be utilized. Defendant objected to the use of any type of "key man discount." Upon further reflection, the court agrees with the defendant that use of a slippage figure was improper.

A detailed discussion of valuation discounts was treated by Harry J. Haynsworth in *Valuation of Business Interests,* 33 Mercer L.Rev. 457 (1982), wherein it was noted that normally applied discounts should not be imposed in a forced sale situation. Haynsworth at 459. Plaintiffs point out that in determining the "fair value" of shares of a closed corporation, the court must consider *"[e]very relevant fact and circumstance* which enters into the value of the corporation property and which reflects itself in the worth of the corporate stock." *Santee Oil Co. v. Cox,* 265 S.C. 270, 217 S.E.2d 789, 791 (1975) (emphasis in original). They assert one factor to be considered by the court in

valuing such stock is the management of the company. *See Santee Oil,* 217 S.E.2d at 792. Utilizing these principles of law, plaintiffs argue a key man discount is appropriate. But as Prof. Haynsworth noted, "[t]he application of these principles ... varies with the circumstances and purpose of the valuation." Haynsworth at 458. Discounts have been used in cases where the executive has already left the company and the company is unable to find a suitable replacement. Haynsworth at 496. Here, Lee is currently employed by the corporation and if he leaves, the Hendleys could certainly continue to effectively manage the business.

Therefore, imposing a key man discount is not appropriate under this set of facts. Applying a discount results in Lee's half interest being found to be less valuable than the Hendleys' half. That finding illuminates the problem of applying a discount to an internal transaction. Discounts properly apply to the total value of the company in a "willing buyer/willing seller" context, but do not apply at all when neither party is willing and the transaction is between insiders. The key man discount ignores that the buyers are already in this business and have a dominant presence in the industry. Any "slippage" is merely temporary in view of their proven ability to perform. Additionally, any key man discount is offset by control premium considerations. By buying Lee's interest, the Hendleys control the company in which they previously owned only one-half. Finally, under the employment contract, the Hendleys' have within their power the ability to fire Lee after they begin operating the business. Although they maintain they will not continue to employ Lee, it would not be unreasonable to believe they may retain him at least for a period of transition. The conflicts between the parties may resolve once Lee is no longer an owner of the company. It is therefore improper for this court to penalize Lee for something the occurrence

---

7. "Customer confidence is critical in this business which is solely a service business. An abrupt change in management could not possibly be advantageous in the short run. Uncertainty would be created with customers, and our competitors would exploit the situation to the detriment of the company." Affidavit of Terry L. Lee dated March 25, 1987.

and effect of which is speculative and which, at any rate, is under the control of the plaintiffs.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties hereto and the subject matter of this case.

2. Dissolution is authorized pursuant to *S.C. Code Ann.* § 33–21–150(a)(3) since the shareholders are so divided respecting management of the business and affairs of the company that the corporation is suffering or will suffer irreparable injury.

3. This court has discretion pursuant to *S.C. Code Ann.* § 33–21–155 to grant relief alternative to a decree of dissolution. Under the circumstances of this case, dissolution is not in the best interest of the corporation or the shareholders, and alternative relief is therefore appropriate.

4. This court has authority to set the fair value of the shares of the corporation pursuant to *S.C. Code Ann.* § 33–21–155(a)(4).

5. The most fair and equitable solution and alternative under the totality of the circumstances and facts of this case is to order the Hendleys to purchase all of the outstanding corporate stock of Lee.

6. The fair value of the shares of stock of I.H. Services, Inc., of North Carolina at the time of the August 20, 1987 hearing is $1,688,348.12, the value of each one-half interest being $844,174.06.

IT IS THEREFORE ORDERED that Dick L. Hendley and Ryan D. Hendley be ordered and directed to purchase, and Terry L. Lee is ordered to sell, Lee's 350 shares of corporate stock in I.H. Services, Inc., of North Carolina for the sale price of $844,174.06.

The company's fiscal year ended October 31, 1987, and the sale of stock ordered herein should have logically coincided with that date. Originally, the purchase and sale ordered herein was to occur on Friday, October 30, 1987, the last business day of the company's fiscal year. Due to the protracted nature of these supplemental proceedings, a new closing date must be ordered. Therefore, the sale shall occur December 15, 1987. If the Hendleys experience difficulty in obtaining financing by this date, they may apply to the court for a reasonable extension.

The plaintiffs suggested to the court in their recent motion that certain tax planning considerations would benefit their position. Various tax options were discussed at the October 23 hearing and Lee seemed to have no objection (as long as he was not prejudiced) to structuring the buy so that plaintiffs would have a more favorable tax position. It was suggested that plaintiffs could actually buy the stock during 1988, when rates would be lower or that they could set aside some of the purchase price as the purchasing of Lee's covenant not to compete. While the court certainly recognizes the fact that tax considerations are of vital importance in a business transaction of this size, it feels it is not qualified and therefore cannot engage in tax planning; such details are best left to the parties.

IT IS FURTHER ORDERED that the defendant, Terry L. Lee, shall execute and deliver all documents necessary to effectuate the transfer of ownership called for hereunder, and shall otherwise cooperate with the plaintiffs to ensure a smooth transition. The defendant has stated he has no objection to the plaintiffs immediately becoming involved with the company.

The parties have requested clarification and guidance from the court regarding Lee's duties during the transition process. Although the court does not relish detailed involvement in the internal concerns of the business, some guidelines are appropriate. Lee agrees he will voluntarily introduce the customers to the plaintiffs and any new management team should the plaintiffs so request. Lee also will provide customers with assurances that the plaintiffs are experienced, capable people and words to like effect. Lee should refrain from revealing any details of this lawsuit or detailed account of the pretrial disagreements and events leading to this decision. He should not make predictions as to whether the corporation will perform less ably if he is leaving it. Lee can state simply that he is

leaving (if in fact he is) because the plaintiffs have bought his stock as a result of a lawsuit.

Lee further agrees that all outstanding proposals to potential customers are assets of the North Carolina corporation. He states he will do all in his power to see to it these proposals become contracts. *See* Defendant's Response to Plaintiffs' Motion to Make Additional Findings, paragraphs 5 & 6. Finally, if Lee leaves the company voluntarily or through termination by the Henleys, he will be bound by the covenant not to compete as previously amended and shall take no action calculated to cause any of the existing customers to cancel their existing contracts with the North Carolina corporation.

IT IS FURTHER ORDERED that all previous restraining orders in this case are dissolved, and the clerk is directed to distribute to Terry L. Lee the $7,500 cash bond posted with the clerk and the 100 shares of corporate stock held as security for his bonds.

IT IS FURTHER ORDERED that all monies owed by Terry L. Lee to Dick L. Hendley for the 1986 purchase of stock shall be deducted from the purchase price to the end that the stock transferred by Lee will be fully paid and transferred free and clear of all encumbrances.

The employment agreement of Terry L. Lee provides for severance pay in the amount of six months of his total earned compensation if Lee is terminated by the Hendleys. If Lee voluntarily leaves the corporation, he is not entitled to additional compensation. This court need not make a determination, as plaintiffs have suggested, as to the status of Lee's employment at this time. Lee's positions as stockholder and employee are separate and distinct. Lee has stated he will continue to run the corporation and act as its president until he is terminated. The court disagrees with plaintiffs that Lee voluntarily quit his position when he sought a sale of his stock. It appears, therefore, that there might be some dispute relating to Lee's possible severance pay rights. Accordingly, this court retains jurisdiction of any matters relating to severance pay for Terry L. Lee. Jurisdiction will also be retained over any other matters which might arise during the execution of the acts called for hereunder.

IT IS SO ORDERED.