Elsa Martschink **MORROW**, Plaintiff,

v.

Fred J. **MARTSCHINK III**, Miles H. Martschink and Pauline C. Martschink, Individually and as Trustees of the Fred J. Martschink, Jr. Trust; and Martschink Realty Company, Inc., Defendants.

Civil A. No. 2:95–0552–18.

United States District Court,
D. South Carolina,
Charleston Division.

Sept. 21, 1995.

H. Brewton Hagood, Richard S. Rosen, Charleston, SC, for plaintiff.

Robert L. Clement, Jr., Timothy W. Bouch, J.J. Anderson, Charleston, SC, for defendants.

## ORDER

NORTON, District Judge.

This matter comes before the court on a hearing to determine the fair value of Plaintiff's interest in Martschink Realty Company, Inc. (hereinafter "Martschink Realty" or "the Company"), a South Carolina closely held corporation. Plaintiff brought this action for dissolution of the corporation. At a March 30, 1995 hearing on Plaintiff's Motion for a Temporary Injunction, which sought to prevent Defendants from taking any action that would impair the value of Plaintiff's stock, the parties agreed to allow the court to determine the fair value of Plaintiff's interest in Martschink Realty so that Defendants might buy out Plaintiff's interest without further litigation. Plaintiff and Defendants each hired a real estate appraiser to give an opinion as to the fair market value of Martschink Realty's real estate and a certified public accountant to give an opinion concerning the appropriate method of valuation and the final value of Plaintiff's interest in Martschink Realty.

The evidence and testimony of the expert witnesses hired by the parties was presented at a hearing on June 21, 1995. In addition to assigning a value to the assets, the court was asked to consider the applicability of two discounts and the propriety of four adjustments to the Company's worth. After hearing and receiving the evidence, reviewing the exhibits and briefs of counsel, and studying the applicable law, this court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent any findings of fact constitute conclusions of law, they are adopted as such; to the extent any conclusions of law constitute findings of fact, they are so adopted.

## I. FINDINGS OF FACT

1. In 1945, Fred J. Martschink (Fred Sr.) formed Martschink Realty Company and engaged in the business of acquiring, leasing, and selling real estate. Except for a small bicycle rental business it owns and some very limited investments in publicly traded stock in other corporations, Martschink Realty is primarily a real estate investment company and its value is dependent upon the value of the real estate it owns.

2. Fred Sr. and his wife Ruth had two children: Elsa Martschink Morrow (Plaintiff or Elsa) and Fred J. Martschink, Jr. (Fred Jr.). Fred Jr. married Pauline C. Martschink (Pauline), and they had two children: Fred J. Martschink III (Fred III) and Miles H. Martschink (Miles). Thus, Plaintiff Elsa is the aunt of individual Defendants Miles and Fred III and the sister-in-law of Defendant Pauline, who is the widow of Fred Jr., Plaintiff's brother. For ease of reference, the pertinent part of the Martschink family tree is as follows:

Fred Sr. (married to Ruth)

Elsa (widowed)     Fred Jr. (married to Pauline)

Fred III                                    Miles

3. Fred Sr. died in 1953 and at that time owned the Company together with his son, Fred Jr., who ran the Company on a part time basis. Upon his death, Fred Sr. left his widow Ruth as the beneficiary of a trust that owned stock in Martschink Realty.

4. Fred Jr. died in 1984 and left his widow Pauline as the beneficiary for her life of certain trusts that own 197 shares of Mart-

schink Realty stock. Miles and Fred III are the remaining beneficiaries of these trusts. When Fred Jr. died in 1984, Pauline served as President until Miles, their son, assumed that position in 1987.

5. Ruth died on July 7, 1991, almost 40 years after her husband's death. Upon Ruth's death, her daughter, Plaintiff, became a stockholder for the first time. Thus, Plaintiff has held stock in Martschink Realty for less than four years of its 50–year existence. In 1948, Plaintiff moved to Cincinnati, Ohio, and, since that time, she has had little contact with Charleston and has not performed any significant act on behalf of the Company.

6. The Company owns and manages various commercial properties in Charleston. As is quite common in small, family-owned corporations, the Company, through the years, has been "land rich" but "cash poor." Due to the demands of caring for Ruth, the founder's widow who resided in a nursing home for many years and died at a substantially advanced age, most of the ready assets were devoted to her care. Though Fred Jr. and Fred III managed the aforementioned trusts and the Company, they deferred all trustee and executor fees for the benefit of their mother and grandmother.

7. Plaintiff's inheritance upon Ruth's death gave her 223.5 shares of Martschink Realty stock. This constitutes 30.2% of the Company's stock. Defendants own or control the remainder of the stock. Defendants Miles and Fred III each own 155.75 shares, or 21.05%, of the total stock. Pauline owns 1.08% of the stock, and the remaining 26.62% is owned by trusts controlled by Defendants.[1]

8. The Company has never paid any cash dividends to its stockholders.

9. The individual Defendants control the operations of the Company and have elected themselves as its officers and directors. They plan to develop the Company's largest and most valuable parcel of real estate known as the Fort Lamar Tracts in the Secessionville area of James Island (hereafter "Secessionville.") They have entered into agreements with the Company to pay themselves salaries, directors' fees, and development fees, to which Plaintiff has objected. Since July 1991, Plaintiff, who owns 30.2% of the stock, has received 7.5% of the money paid by the Company to its shareholders. As a result of Defendants' failure to address Plaintiff's concerns, Plaintiff commenced this action on February 28, 1995 alleging a cause of action for dissolution of the corporation under the South Carolina Business Corporations Act. Plaintiff alleges oppression and unfair dealings by Defendants and seeks a dissolution, or in the alternative, an order requiring that her shares be bought by Defendants at their fair value.

10. The assets of Martschink Realty are essentially all real estate with the exception of a bicycle business valued by Defendants' accountant at $26,000.00, cash of approximately $22,500.00, and $15,000.00 in investment stock. The corporation owns an entire or partial interest in the following parcels of real estate:

(a) Developed commercial property at 26–28/30–32 Cumberland Street in the City of Charleston;

(b) Undeveloped parcel on Arco Lane in the City of North Charleston (50% interest);

(c) Developed commercial property at 426 Coleman Boulevard in the Town of Mt. Pleasant (60% interest);

(d) Commercial property developed as a movie theater at 245 East Bay Street in the City of Charleston;

---

**1.** The exact distribution of shares in Martschink Realty is as follows:

|   |   |   |
|---|---|---|
| a. | 260 shares | Treasury stock |
| b. | 223.5 shares | Plaintiff |
| c. | 197 shares | Fred J. Martschink, Jr. Trust, FBO, Pauline C. Martschink |
| d. | 155.75 shares | Fred J. Martschink, III |
| e. | 155.75 shares | Miles H. Martschink |
| f. | 8 shares | Pauline C. Martschink |

(Gumb Report).

(e) Undeveloped tracts in the Secessionville area of the Town of James Island (known as Fort Lamar Tracts I, II, and III);

(f) Parcel on Lowcountry Boulevard in the Town of Mt. Pleasant (50% interest).

### Real Estate Appraisal

■ 11. Plaintiff and Defendants hired real estate appraisers to appraise the property of Martschink Realty. Plaintiff hired Emerson B. Read and Defendants hired Stephen C. Attaway. Mr. Read originally appraised the properties in September 1992 and updated the appraisals before the hearing on this matter. He testified that his valuations of the Secessionville, Coleman Boulevard and Arco Lane properties were unchanged from his September 18, 1992 appraisal report. Defendants' expert, Mr. Attaway, provided full appraisals of all the properties as of June 1, 1995.

12. Appraisals performed by Mr. Read indicate the fair market value of Martschink Realty's interest in the real estate as follows:

| | | |
|---|---|---:|
| (a) | 26–28/30–32 Cumberland Street | $ 700,000.00 |
| (b) | Arco Lane parcel (50% interest) | 147,500.00 |
| (c) | 426 Coleman Boulevard (60% interest) | 258,000.00 |
| (d) | 245 East Bay Street | 412,500.00 |
| (e) | Fort Lamar Tracts I, II, and III (Secessionville) | 1,230,000.00 |
| (f) | Lowcountry Blvd. (50% interest valued at original cost) | 27,500.00 [2] |
| | Total Value Per Mr. Read | $2,775,500.00 |

13. Appraisals performed by Mr. Attaway indicate the fair market value of Martschink Realty's interest as follows:

| | | |
|---|---|---:|
| (a) | 26–28/30–32 Cumberland Street | $ 830,000.00 |
| (b) | Arco Lane acreage (50% interest) | 87,500.00 |
| (c) | 426 Coleman Boulevard (60% interest) | 252,000.00 |
| (d) | 245 East Bay Street | 425,000.00 |
| (e) | Fort Lamar Tracts I, II, and III (Secessionville) | 973,000.00 |
| (f) | Lowcountry Blvd. (50% interest) | 37,500.00 |
| | Total Value Per Mr. Attaway | $2,605,000.00 |

14. Defendants argue that Mr. Attaway's appraisals more carefully reflect the value of the properties. Defendants suggest the following reasons for adopting Mr. Attaway's appraisals:

a. Plaintiff's expert stated he used no comparable properties to assess the value of either Arco Lane or Secessionville.

b. For Arco Lane, Mr. Attaway testified that, due to zoning changes, limited access, and a controversial commercial development a short distance away, which has attracted substantial opposition from the United States Air Force and other community leaders, a lower value would be appropriate. This was also reflected in the comparable sales utilized in his appraisal. Mr. Read made no such adjustments.

c. Mr. Read's valuation of Secessionville is not as thorough as Mr. Attaway's. Since Mr. Read's appraisal in 1992, the following changes have occurred: (1) the Town of James Island has been incorporated; (2) the Town has enacted an Historic Preservation Ordinance; (3) the Stormwater Management Act has been implemented by the South Carolina Department of Health and Environmental Control; (4) one of the three parcels in Secessionville has been subdivided; and (5) the Fort Lamar Preservation Society has been organized to restrict development on the Secessionville Tract. Mr. Read admitted that all these items will likely have a negative effect on the full development of the Secessionville Tract.

2. Mr. Read did not enter a valuation of the Lowcountry Boulevard tract, which was recorded by Plaintiff's CPA at its purchase price of $55,000. (Testimony of McGuire).

d. The Secessionville Tract includes 10+ acres of Fort Lamar, a notable Civil War battlement. The Tract is on the National Historic Trust. Pursuant to direction of the State Archives and History Department, it has been determined that substantial Indian and prehistoric burial sites may exist on the property which require substantial archeological work prior to any development. Mr. Read admitted in his appraisal that 10+ acres cannot be developed due to historic and archaeologic reasons. (Section II, Subject Prop. 5, Ft. Lamar Acreage, James Island, SC, Plaintiff's Exhibit at p. 26). This 10+ acres, however, were not subtracted from the per-acre price in his appraisal. (*Id.* at pp. 25–29). Mr. Read further testified that $400,000+ in development costs were evident to him in 1992. The events which have transpired as set forth above since 1992 would likely result in a change in that figure.

e. There is a recorded Option and Easement giving third parties rights to portions of the property. (Appraisal of Three Adjacent Tracts Fort Lamar Road Town of James Island Charleston County, South Carolina, by Stephen C. Attaway, MAI, at page 98). These title impediments are recorded in the Charleston County RMC Office in Book G–56, Pg. 613, and at Book G–56, Pg. 295. Mr. Read does not take the existence of these title impediments into consideration. The option, the validity of which is a matter of separate litigation, provides that the optionor can acquire significant parcels of the Secessionville Tract for $300 per acre. (Appraisal of Three Adjacent Tracts Fort Lamar Road Town of James Island Charleston County, South Carolina, by Stephen C. Attaway, MAI, at page 98). Mr. Attaway has valued the Option and Easement in his appraisal, which value is reasonable. (Appraisal of Three Adjacent Tracts Fort Lamar Road Town of James Island Charleston County, South Carolina, by Stephen C. Attaway, MAI, at page 98).

15. Considering these possible infirmities in Plaintiff's appraisal, this court will assign Mr. Attaway's appraisals at ⅔ weight and Mr. Read's appraisals a ⅓ weight in reaching a total value. The court therefore finds that the fair market value of the real estate owned by Martschink Realty is as follows:

| | | |
|---|---|---|
| (a) | 26–28/30–32 Cumberland Street | $ 786,666.67 |
| (b) | Arco Lane parcel (50% interest) | 107,500.00 |
| (c) | 426 Coleman Boulevard (60% interest) | 254,000.00 |
| (d) | 245 East Bay Street | 420,833.33 |
| (e) | Fort Lamar Tracts I, II, and III | 1,058,666.67 |
| (f) | Lowcountry Blvd. (50% interest) | 34,166.67 |
| | Total Value of Real Estate | $2,661,833.34 |

16. After determining the value of Martschink Realty's real estate assets, the court must determine the appropriate method of stock valuation and which adjustments should be made to calculate the value of the entire stock in Martschink Realty and the fair value of Plaintiff's 30.2% interest. While the opinions of fair market value of the corporation's real estate were within 6% of each other in the aggregate, the difference in Plaintiff's interest testified to by the parties' CPAs ranged from a low of $342,060.00 to a high of $815,000.00, dependent upon which method of valuation is used and which adjustments are made when performing the calculations.

*Stock Valuation*

17. Plaintiff and Defendants hired certified public accountants to ascertain the value of Martschink Realty. Plaintiff hired Mr. Herbert McGuire, Jr. and Defendants hired Mr. Barry Gumb. Both parties' CPAs utilized the Net Asset Value method of valuation and then made adjustments to the net asset value.[3]

3. Mr. Gumb also utilized the "Excess Earnings Method," which attempts to calculate the existence of any "good will" that would provide excess earnings over the net asset value determined. Because the Company is essentially a real estate company, no "good will" or excess earnings were established through this calculation. As of the date of the hearing on this matter, the parties agreed that, since Martschink Realty is a real estate investment company, the

18. Mr. Gumb added to the value of the real estate the value of the equipment and stocks owned by the Company, while Mr. McGuire dismissed these figures as *de minimis*. The court will consider the value of the equipment, $11,443, and the stocks, $1,898, in reaching a fair value. Therefore, adding the equipment and stock value, $13,341.00, to the above-calculated value of the real estate, $2,661,833.34, the court finds an increased asset value of $2,675,174.34.

19. *Mr. McGuire's Adjustments and Valuation*

Mr. McGuire determined the total value of the corporation using Mr. Read's appraisal of the real estate. Mr. McGuire made a few adjustments, including (a) the elimination of a liability on the corporate books for accrued loan guarantee fees voted for themselves by Defendants in the amount of $110,853.00; and (b) an adjustment of $224,543.00 to reflect additional asset value the corporation would have accumulated if the real estate had been managed at an assumed 7% rate charged by an independent property manager rather than the salaries and fees paid to Defendants from 1991 to 1995 to manage the company.

20. *Loan Guarantee Fees*

Mr. McGuire prepared a schedule to support his opinion that $110,853.00 in loan guarantee fees should not be considered as a liability when determining the fair value of Plaintiff's interest in Martschink Realty. Pl.'s Ex. 11. The contract for these fees was entered into between the Company and the individual Defendants prior to Plaintiff becoming a stockholder. The fees have been carried on the books of the Company but all payment deferred pending the sale of property.

Mr. McGuire testified that the loans guaranteed by Fred and Miles were fully secured by mortgages on real estate with equity far in excess of the amount of the loans so that virtually no risk was assumed by them in guaranteeing the loans. Martschink Realty has been able to fund all payments on the

loans, which date back to 1986, and the largest loan of $425,000.00 on the Coleman Boulevard property has been completely paid off without any amount being paid by the Martschink brothers. For guaranteeing this loan, Defendants accrued a loan guarantee fee of $42,020.00.

Testimony from Defendants' CPA, Mr. Gumb, indicates that, in order to obtain financing for the refurbishment and development of the commercial properties, the Martschink brothers were required to personally guarantee these loans. Further, Mr. Gumb testified that these guarantees substantially affected the individual Defendants' personal assets and restricted those Defendants in their personal endeavors. On cross-examination, Mr. McGuire agreed that, as a CPA, he would be required to disclose the existence of these fees if he were preparing financial statements for those individuals.

21. *Salaries and Fees*

Mr. McGuire also prepared a schedule showing the amount of salaries and fees paid by Defendants out of the corporate operating funds since Plaintiff inherited her stock in July of 1991 to demonstrate that the corporation would have been able to reduce its expenses by $224,543.00 if it had hired an independent property manager at the rate of 7% rather than paying the fees and salaries that Defendants voted to pay themselves.

Defendants note that Martschink Realty is a "C" corporation for tax purposes. Mr. Gumb testified that a "C" corporation is not the best form of operation for a real estate company, because it provides for substantial tax liability on the disposition of assets. If the Company were to liquidate proceeds from the sale of any of its assets, it would be taxed once at the corporate level and again when proceeds were distributed to the shareholders. Dividend distributions to shareholders of "C" corporations are not deductible and are taxed to the recipients. While Martschink Realty could elect to be taxed as an "S" corporation in the future, Mr. Gumb testified that such election would not elimi-

most appropriate and accurate method of calculating fair value is to determine the net value of the corporation's assets rather than using other

methods of valuation, such as the liquidation value method or the excess earnings method.

nate inherent gain in assets owned prior to the election. Much of the real estate is held with an extremely low basis reflecting its purchase price in the 1940's and 1950's.

Due to its status as a "C" corporation, all shareholders have been paid a salary and/or director's fees throughout the Company's existence to avoid the double taxation embodied in a dividend distribution. Since 1984, Miles and Fred III have been responsible for the day-to-day management and leasing associated with the Company's real property. They were paid salaries, bonuses, and director fees, but they were not paid sales or leasing commissions. Pauline performs administrative duties and is an officer of the Company. She is paid a salary of $500 per month. Plaintiff performs no duties for the Company but is named as Assistant Secretary of the Company. Plaintiff is paid a salary of $450 per month. The Company has paid an average annual total of $68,738.00 in salaries, bonuses, and directors' fees since 1991. (Gumb Report).

22. Applying these adjustments, Mr. McGuire's testimony was that the fair value of Plaintiff's interest in Martschink Realty is as follows:

| | |
|---|---:|
| **Read Real Estate Appraisal** | $2,775,500.00 |
| + **Add Loan Guarantee Fees Already Incurred** | $ 110,853.00 |
| + **Add Excess Salaries and Fees Already Incurred** | $ 224,543.00 |
| + **Add Secessionville Development Costs Already Incurred** | $ 56,601.00 |
| + **Add Nonproperty Assets** | $ 46,005.00 |
| − **Subtract Corporate Liabilities** | ($ 437,135.00) |
| | |
| **Net Asset Value** | $2,776,367.00 |
| × **Multiply by Plaintiff's Percent Share** | 30.2% |
| | |
| **Plaintiff's Interest** | $ 838,462.83 |
| − **Subtract Salary Already Received by Plaintiff** | ($ 24,000.00) |
| | |
| **Plaintiff's Adjusted Interest in Martschink Realty** | $ 814,462.83 |

23. *Mr. Gumb's Adjustments and Valuation*

Defendants' CPA, Mr. Gumb, performed a similar analysis but did not reverse the $110,853.00 loan guarantee fee accrual or adjust expenses for the $224,543.00 directors' fees and salaries paid to Defendants. Mr. Gumb started with Mr. Attaway's real estate appraisal of $2,605,000, made two adjustments to Mr. Attaway's $973,000.00 appraisal of Secessionville, and applied two discounts before reaching Plaintiff's interest.

24. *Deduction of $248,600.00 in Projected Income Taxes*

Mr. Gumb testified that taxes on the value of Secessionville should be a proper adjustment to the fair market value of the Company. Secessionville is a large, undeveloped tract that is currently undergoing development by the Company. While the other properties with significant value are presently utilized in their highest and best use as income-producing, commercial properties, Secessionville is vacant land. The sale or disposal of the Company's other commercial property is not required to achieve its maximum return. Secessionville, however, must be sold in order to recognize any value or any gain from that corporate asset. Regardless of the method or the identity of the seller, significant taxes may be paid. The amount of projected taxes calculated by Mr. Gumb is $248,600.

Mr. McGuire did not make deductions for income taxes on the future development of the Secessionville property, since he thought it unlikely such taxes would be paid in consideration of good tax planning and the history of Martschink Realty's method of avoiding income tax liability in the past. Martschink Realty has paid no taxes since 1991 when Plaintiff inherited her stock.

25. *Deduction of $208,250.00 in Secessionville Developments Costs*

■ There is considerable confusion surrounding the deduction of development costs

for Secessionville. There was confusion at the hearing held on June 21, 1995 as to whether Mr. Attaway's appraisal of $973,000.00 for Secessionville had already taken into consideration $208,250.00 in future development cost, $158,250.00 of which is archeological cost and $50,000 of which is normal site development. As a result, the court requested a letter from Mr. Attaway concerning this issue. Mr. Attaway sent a letter to the court dated June 25, 1995, which indicates that the $600,000.00 value for Tract I of the three Fort Lamar Tracts took into consideration that $116,700.00 had already been spent prior to the appraisal and that an additional $208,250.00 would be spent in the future.

Mr. Gumb initially deducted $91,488 as development costs to be incurred in the future. (Gumb Report). Mr. Attaway included this figure, however, in his net appraisal value. (Testimony of Attaway). Therefore, this amount should not otherwise be further deducted from the Net Asset Value computation.

Further, Mr. Gumb suggested that Mr. McGuire had properly reduced the value of Martschink Realty's assets by $60,161 for development expenses previously incurred, but had failed to make the same reduction for an additional $56,601 incurred in 1994.

This court finds that no adjustments should be made to the value of Secessionville for previous or future development costs. The task at hand is to assign a current value to the property and Plaintiff's shares. Therefore, future developments costs should not be considered. Further, the CPAs evaluating the stock need not second guess or duplicate the efforts of the real estate appraisers, who each gave good faith, current or updated estimates of the value of the property, taking into consideration all relevant factors, including development costs. Mr. Attaway's June 25, 1995 letter indicates that he adjusted for past and future development costs in appraising Secessionville. Especially in light of the fact that the court has adopted a real estate appraisal between the values offered by Plaintiff's and Defendants' appraisers, this court determines that it would be inappropriate and duplicative to adjust for developments costs surrounding Secessionville.

26. *Assessment of a 20% Minority Discount and a 25% Marketability Discount*

Plaintiff is in a minority position. Her voting share does not allow her any elements of control solely through her own vote. Plaintiff's ownership interest is not easily marketable because of the inherent difficulty in selling such interests in family-owned, close corporations. For these reasons, Mr. Gumb assessed a minority discount and a lack of marketability discount against Plaintiff's 30.2% stock interest, which significantly reduces Plaintiff's share of the net asset value. Mr. McGuire opined that, because of the nature of the Company and the circumstances surrounding the buy-out, Plaintiff's 30.2% interest should be calculated without deduction for minority or marketability discounts.

27. Applying these adjustments, Mr. Gumb's testimony was that the fair value of Plaintiff's interest in Martschink Realty is as follows:

| | |
|---|---|
| **Attaway Real Estate Appraisal** | $2,605,000.00 |
| − Subtract Projected Tax on Secessionville | ($ 248,600.00) |
| + Add Value of Nonproperty Assets | $ 59,345.00 |
| − Subtract Corporate Liabilities | ($ 437,135.00) |
| | |
| **Net Asset Value** | $1,978,610.00 |
| × Multiply by Plaintiff's Percent Share | 30.2% |
| | |
| **Plaintiff's Interest** | $ 597,540.22 |
| − Subtract 20% Minority Discount | ($ 119,508.04) |
| − Subtract 25% Marketability Discount | ($ 119,508.04) |
| + Plaintiff's Interest in Cumberland Bicycles | $ 3,132.00 |
| | |
| **Plaintiff's Adjusted Interest in Martschink Realty** | $ 361,656.14 |

## II. CONCLUSIONS OF LAW

A. This court has jurisdiction to consider the dispute between the parties pursuant to 28 U.S.C. §§ 1332 and 1441 since there is diversity of citizenship between the parties and the amount in controversy exceeds $50,-000.00. South Carolina law applies to this action for all matters affecting the substantive rights of the parties.

■ B. This is an action in equity. The court is hearing this matter non-jury. In an action tried without a jury, the trial court is the finder of fact. The court's determination of the facts must be based upon its view of the preponderance of the evidence in the entire record. *Segall v. Shore,* 269 S.C. 31, 236 S.E.2d 316, 317 (1977); *Townes Associates, Ltd. v. City of Greenville,* 266 S.C. 81, 221 S.E.2d 773 (1976).

C. The statutory law in South Carolina provides for judicial dissolution of corporations under certain circumstances:

The circuit courts may dissolve a corporation: ...

(2) in a proceeding by a shareholder if it is established that: ...

(ii) the directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, fraudulent, oppressive, or unfairly prejudicial either to the corporation or to any shareholder (whether in his capacity as a shareholder, director, or officer of the corporation); ...

(iv) the corporate assets are being misapplied or wasted.

S.C.Code Ann. ` § 33–14–300 (Law.Co-op. 1990).

D. The statutory law in South Carolina also provides that when a shareholder brings an action for judicial dissolution, a court may, instead of dissolving the corporation, order the corporation or the other shareholders to purchase the shares of any shareholder at their fair value.

(d) In any action filed by a shareholder to dissolve the corporation on the grounds enumerated in Section 33–14–300, the court may make such order or grant such relief, other than dissolution, as in its discretion is appropriate, including, without limitation, an order: ...

(4) providing for the purchase at their fair value of shares of any shareholder; either by the corporation or by other shareholders.

(e) The relief authorized in subsection (d) may be granted as an alternative to a decree of dissolution or may be granted whenever the circumstances of the case are such that the relief, but not dissolution, is appropriate.

S.C.Code Ann. § 33–14–310 (Law Co-op. 1990); *see Hite v. Thomas & Howard Co.,* 305 S.C. 358, 409 S.E.2d 340 (1991); *Kreischer v. The Kerrison's Dry Goods Co.,* Civil Action Number 2:91–3255–2 (D.S.C. May 1, 1995).

E. Section 33–14–300 is jurisdictional, and asking for judicial dissolution under that section is merely a prerequisite for obtaining other forms of relief under section 33–14–310. *Kreischer* at 23–24.

F. The court specifically does not make any finding on the existence of illegality, fraud, oppressive conduct, or unfairly prejudicial conduct. This proceeding was suggested by the court purely to facilitate the stated wishes of the parties that Plaintiff's shares be redeemed. This court's Order establishes the fair value of Plaintiff's holdings. No further determination has been made by the court at this time, nor should any be assumed.

■ G. In appraising the fair value of stock, South Carolina law indicates that, where applicable, at least three values should ordinarily be taken into account—market value, investment value, and net asset value—and then a proper weight should be given to each value in order to determine the fair value of the stock. *See Santee Oil Co. v. Cox,* 265 S.C. 270, 217 S.E.2d 789 (1975); *Metromont Materials Corp. v. Pennell,* 270 S.C. 9, 239 S.E.2d 753 (1977); *Dibble v. Sumter Ice & Fuel Co.,* 283 S.C. 278, 322 S.E.2d 674 (Ct.App.1984). The proper weight to be given to these criteria varies with the type of business. Harry J. Hayns-

worth, *Valuation of Business Interests,* 33 Mercer L.Rev. 437, 460 (1982).

■ Market value is an established market price at which the shares of a corporation are traded. *Metromont,* 239 S.E.2d at 761. The court concludes that there is no established market value for the shares of this closely held family corporation. Therefore, the court gives this factor no weight.

■ Investment value or capitalization value is determined by multiplying a corporation's earnings by an appropriate multiplier. *Santee Oil,* 217 S.E.2d at 793. The court concludes that this corporation is essentially a real estate holding company whose value is dependent upon the value of its interest in the real estate assets it owns. Therefore, this factor likewise is given no weight.

■ Net asset value is the net value of all the corporation's assets. *Santee Oil,* 217 S.E.2d at 792. As a general rule, more weight is given to asset value than to earnings in an asset holding company such as a real estate business, whereas the reverse is generally true of a manufacturing company or other company producing goods and services. Haynsworth at 460. In *Metromont,* the South Carolina Supreme Court assigned net asset value a 95% weight for a closely held family corporation whose assets were principally real estate. In the present case, the court concludes that essentially all of the value of the corporate shares derives from the net asset value of the corporation, and therefore the court concludes that the corporation's net asset value represents the fair value of the corporation's stock.

H. *Plaintiff's Addition of $110,853 in Loan Guarantee Fees*

■ Plaintiff cites no authority for the adjustment for previously incurred loan guarantee fees. While Plaintiff claims that the guarantees were illusory and that the value of the property owned by the Company exceeded the amount of loans outstanding, making the probability of the guarantees being called remote, this court cannot say that the fees were so unreasonable that they should be erased as a previously entered corporate liability. According to Mr. McGuire, the amount of the fees, together with the interest rate charged on the loans by the bank, would make an effective interest rate of 9.3%. The court therefore finds that the loan guarantee accrual of $110,853.00 should remain as a corporate liability in the calculation of the fair value of the Plaintiff's interest in the corporation.

I. *Plaintiff's Addition of $224,543 in Excess Salaries and Fees*

Plaintiff cites no authority for the adjustment for excess salaries and fees. Further, Defendants assert that the salaries and fees were not excessive. Defendants suggest that, to accurately determine the relative receipt of the shareholders, the $24,000 salary received by Plaintiff should be reclassified as a dividend, since Plaintiff performed no activity to justify a salary. Making this reclassification for each shareholder, Fred III and Miles earned a combined income of $63,274 for the most recent fiscal year. After a reduction for imputed dividends, Miles was compensated at a rate that equates to approximately $24.00 per hour and Fred III was compensated at a rate that equates to approximately $22.00 per hour.

Mr. Gumb determined it was not unreasonable that a non-commissioned real estate agent would command an annual salary equal to the combined income of the brothers during the most recent fiscal year of $63,274 net of imputed dividends. A salaried manager would be required to handle the three multiple-unit commercial properties, which responsibilities include leasing, rent collection, maintenance and capital improvement. In addition, the Company requires development marketing and sales activities on the remaining three parcels. Gumb found that a salary level of $63,000 would leave a return to shareholders of $19,200 as dividends. This disparity is not unreasonable since a large part of the salary is to realize a return to the shareholders on the non-income producing asset of Secessionville.

Based on the above, this court finds that Plaintiff's suggested adjustment for excess salaries and fees should not be taken into account in fixing the fair value of Plaintiff's interest in Martschink Realty.

### J. Gumb Deduction of $248,600.00 in Projected Income Taxes

■ In determining the net asset value of the corporation, the court concludes that it is improper to deduct $248,600.00 for projected income taxes on the development of the Secessionville property. Such a deduction would be improper for a number of reasons. First, the court has not been presented with any case law supporting Defendants' position on this issue. In fact, in valuing a corporation for buy-out purposes in *Segall v. Shore*, 269 S.C. 31, 236 S.E.2d 316 (1977), the South Carolina Supreme Court rejected an appraisal that made a deduction for taxes to be paid in the event of a corporate liquidation. The court found no reason in the course of a corporate valuation to subject the plaintiff's "interest to a corporate tax, which may never be paid." *Id.* 236 S.E.2d at 318.

Secondly, Mr. Gumb's calculation of taxes is inaccurate in light of Mr. Attaway's assumptions in his appraisal and his letter clarifying the appraisal. Mr. Gumb's income tax adjustment is explained on the third page of Exhibit A to his report. He uses the fair market value of $973,000.00 reported by Mr. Attaway for all three tracts in Secessionville. However, when he deducts development cost as an adjustment in basis to the property for purposes of calculating the taxable gain, he only deducts the $208,250.00 which Mr. Attaway assumes would be spent in the future for Tract I rather than the entire cost of $324,950.00 referred to in Mr. Attaway's June 25, 1995 letter. In effect, Mr. Gumb charges Plaintiff with the cost of developing the property without the benefit of receiving the increased income from development. He also ignores other expenses which the corporation will use to offset taxable gains such as payment of development fees of 8% which Defendants have contracted to pay themselves and salaries presently being paid to Defendants while the property is being developed for sale. The company history indicates careful planning to avoid any corporate income tax. For these reasons, the court rejects Defendants' argument that $248,600.00 should be deducted from the net asset value of the Company.

### K. Minority and Marketability Discounts

The final step in valuing a particular interest in a business is to take into account any viable discounts. Harry J. Haynsworth, *Valuation of Business Interests*, 33 Mercer L.Rev. 437, 488 (1982). As previously stated, Mr. Gumb assessed a 20% minority discount and a 25% marketability discount.

■ A lack of marketability discount may be applied if there is a difficulty in selling interests due to the closely held nature of the business. Haynsworth at 489. Such interests are less marketable and, therefore, less valuable than equivalent interests in companies whose securities are regularly traded in a recognized market. *Id.* An astute investor will pay less for an interest that cannot be freely traded, and a discount to compensate for this illiquidity factor is well established. *Id.*

■ A minority discount may be applied if the interest being sold is less than 50% of the voting stock. Practitioners Publishing Company, *Guide to Business Valuations* at 815–04. The owner of such an interest has no ability to have any significant control over the operations of the business, the payment of dividends, the ability to receive wages, or to become involved in the day-to-day business activities of the corporation. *Id.* at 815–05; *South Carolina Nat'l v. McLeod*, 256 F.Supp. 913, 928 (D.S.C.1966). Therefore, a potential investor in a closely held corporation is willing to pay more per share for a majority interest in the business than a minority interest.

■ Plaintiff argues that discounts should not apply in this situation, citing as authority cases in which minority shareholders exercised their rights under dissenting shareholder statutes. Defendants correctly argue, however, that this is not a dissenters' rights case, since no merger, exchange, or by-law change is at issue. *See* S.C.Code Ann. § 33–13–102 (1976 as amended). Nevertheless, the same principles that caution against minority and marketability discounts in dissenters' rights cases apply here to the "family buy-out" situation. It is clear that discounts are not always applicable, even

though the interest being valued represents a minority and lacks marketability. Haynsworth at 489. "For example, it would be inappropriate to impose a discount in a dissenters' rights case or in a case where a minority interest has been improperly squeezed out of the business. Allowing discounts in these situations would undercut the purpose of dissenters' rights statutes to give minority shareholders the fair value of their shares, and it could also encourage squeeze outs." *Id.*

Furthermore, a lack of marketability discount is especially inapplicable to "an intrafamily transfer" in a closely held company. *Id.* n. 92. "In family businesses, the members do not want outsiders to have ownership interests. Thus, the lack of marketability can actually enhance the value of the stock or partnership interest." *Id.*

This court has stated that "normally applied discounts should not be imposed in a forced sale situation." *Hendley v. Lee*, 676 F.Supp. 1317, 1330 (D.S.C.1987) (citing Haynsworth at 459). "Discounts properly apply to the total value of the company in a 'willing buyer/willing seller' context, but do not apply at all when neither party is willing and the transaction is between insiders." *Id.*

This court concludes that no minority discount or marketability discount should be applied to reduce the fair value of Plaintiff's shares. These discounts have not been recognized in South Carolina in the context of corporate dissolution actions and have been rejected by many courts. *See, e.g.*, "Propriety of applying minority discount to value of shares purchased by corporation or its shareholders from minority shareholders," 13 A.L.R.5th 840, 850 (1993); Balmonte, *Measuring stock value in appraisals under the Illinois Business Corporation Act*, 80 Ill.B.J. 236 (1992); Heglar, *Rejecting the minority discount*, 1989 Duke L.J. 258 (1989). Assessment of such a penalty would, in effect, compensate Defendants as if they had paid a premium for their own inherited stock in Martschink Realty. Further, Plaintiff is not selling her stock in the open market, but instead will be selling her stock to the Company or family-member Defendants who own the rest of the Company. While there may be a limited market for sale of stock in Martschink Realty, there is a substantial and active market for the real estate it owns. Finally, none of the shareholders owns a majority interest in the corporation, and Plaintiff, in fact, owns more of an interest at 30.2% than any other single shareholder. Therefore, the court will use no discounts in calculating the value of Plaintiff's interest.

## III. CONCLUSION

For the foregoing reasons, the court concludes that the fair value of Plaintiff's shares in Martschink Realty is 30.2% of the net value of its assets, calculated as follows:

| | |
|---|---|
| Value of Real Estate | $2,675,174.34 |
|   + Add Nonproperty Assets | 46,005.00 |
|   − Subtract Liabilities | (   437,135.00) |
| | |
| Net Asset Value | $2,284,044.34 |
|   × Multiply by Plaintiff's Percent Share | 30.2% |
| | |
| Plaintiff's Interest in Martschink Realty | $  689,781.39 |

It is therefore

**ORDERED** that the parties advise the court by November 15, 1995 whether Defendants will purchase Plaintiff's interest. If the parties fail to agree to such a purchase, the court will enter a scheduling order to conclude discovery on the issues presented in this case and schedule the case for trial.

AND IT IS SO ORDERED.