**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JANE P. KREISCHER; CHARLES F.
KREISCHER; EDWIN F. KREISCHER;
BARBARA W. KREISCHER,
Plaintiffs-Appellants,

v.

THE KERRISON DRY GOODS COMPANY;
EDWIN H. POULNOT, III; DALE
WIDMAN; GENE POULNOT RIGGS;
DAVID LAWRENCE POULNOT; JOAN
HUTCHINSON POULNOT,
Defendants-Appellees.

No. 97-1230

JANE P. KREISCHER; CHARLES F.
KREISCHER; EDWIN F. KREISCHER;
BARBARA W. KREISCHER,
Plaintiffs-Appellees,

v.

THE KERRISON DRY GOODS COMPANY;
EDWIN H. POULNOT, III; DALE
WIDMAN; GENE POULNOT RIGGS;
DAVID LAWRENCE POULNOT; JOAN
HUTCHINSON POULNOT,
Defendants-Appellants.

No. 97-1800

Appeals from the United States District Court
for the District of South Carolina, at Charleston.
C. Weston Houck, Chief District Judge.
(CA-91-3255-2-12)

Argued: September 25, 1998

Decided: January 26, 1999

Before MURNAGHAN, WILKINS, and LUTTIG, Circuit Judges.

_____

Affirmed in part and remanded with instructions by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** J. Robert Howard, NALL, MILLER, OWENS, HOCUTT & HOWARD, Atlanta, Georgia, for Appellants. Robert Buford Wallace, WALLACE & TINKLER, Charleston, South Carolina, for Appellees. **ON BRIEF:** Jan Pontrelli, NALL, MILLER, OWENS, HOCUTT & HOWARD, Atlanta, Georgia; J. Rutledge Young, Jr., Stephen P. Groves, Sr., YOUNG, CLEMENT, RIVERS & TISDALE, Charleston, South Carolina, for Appellants. Paul E. Tinkler, WALLACE & TINKLER, Charleston, South Carolina; T. Alexander Beard, BEARD LAW OFFICES, Charleston, South Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

The instant case is an appeal by the plaintiffs, Jane Poulnot Kreischer, Charles F. Kreischer, Edwin F. Kreischer, and Barbara W. Kreischer (collectively "the Kreischers"), who were minority stockholders of The Kerrison Dry Goods Company, Inc. ("Kerrisons" or "the Company"). The stock of Kerrisons was largely owned by Edwin H. Poulnot, III, Dale Poulnot Widman, Gene Poulnot Riggs, David Lawrence Poulnot, and Joan Hutchinson Poulnot (collectively "the Poulnots"). The Kreischers contended that there were erroneous legal

2

conclusions of the district court, including its holding that the defendants, the Poulnots, did not violate their fiduciary duties as majority stockholders in a close corporation and by ordering by the Poulnots of a relatively low amount at which to purchase the Kreischer stock. The Poulnots filed a cross appeal, claiming that the court erred in failing to apply minority and marketability discounts in evaluating the minority interest at the valuation phase of the trial. The Kreischers seek more than $3,000,000 as the value of the stock that they own and desire for the corporation to repurchase from them. Because the Kreischers appeared to suffer no individual injuries, we affirm the decision of the district court.

The factual background, as found by the district court at the liability phase of the trial, is as follows:

The Kreischers seek to have the corporate defendant, Kerrisons, judicially dissolved pursuant to S.C. CODE ANN. § 33-14-300 (Law. Co-op. 1990). The Kreischers contend that the Poulnots have engaged in a series of oppressive, illegal, and fraudulent acts all in an effort to squeeze the Kreischers out of their minority interest in Kerrisons. Alternatively, they claim that the Poulnots have wasted and misapplied the corporate assets of Kerrisons to such an extent that dissolution is warranted.

The Kreischers are minority shareholders who own approximately 28% of the stock in Kerrisons. The defendants are Kerrisons, a department store and three small women's specialty shops including substantial real estate holdings, and the majority shareholders, "the Poulnots," who own approximately 72% of the stock in the Company. The Poulnots are members of the board of directors and also hold various positions as officers.

The Kreischers' complaint was filed on October 28, 1991. The six causes of action alleged by the Kreischers are as follows: breach of fiduciary duties by the directors of the Company (Count One); breach of fiduciary duties by the officers of the Company (Count Two); fraud (Count Three); conspiracy (Count Four); oppression (Count Five); and negligence, mismanagement, waste, and misapplication of corporate assets (Count Six).

3

The Kreischers brought the suit in their individual capacities and not as a derivative action on behalf of the corporation. They did so because they assert that "squeeze-out" suits are not derivative actions.

On that basis, the Poulnots moved for and were granted partial summary judgment as to counts one through four on the ground that the Kreischers suffered no individual damages as a result of the events of which they complained.[1] Counts five and six were permitted to proceed to trial, because individual shareholders may maintain such actions under S.C. CODE ANN. § 33-14-300.

The district court bifurcated the trial into liability and valuation phases. A jury was selected and began hearing evidence in the liability phase, but the court dismissed the jury on July 28, 1993. It did so because it concluded that judicial dissolution proceedings under § 33-14-300 are equitable, not legal, and thus it must decide whether to grant the requested relief.

The district court found that the Kreischers' allegations fell into the following categories: (a) common law oppression; (b) stock fraud and manipulation; (c) the Poulnots' desire to control the entire company; (d) inadequate dividend return to the 28% minority shareholders; (e) using corporate funds personally to benefit the Poulnot majority shareholders and officers; (f) failure to disclose true financial information involving officers of the Company; (g) willful hostility toward the minority shareholders and outside directors; (h) conscious disregard for the rights of minority shareholders and outside directors; (i) failure to abide by the corporate bylaws; (j) failure to reveal to the minority shareholders the true financial state of the Company when attempting to purchase their minority interest; (k) large financial benefits to the Poulnots in terms of salaries, bonuses, and other compensation; (l) violations of the IRS Code; (m) dishonest and deceitful management; (n) falsifying documents; (o) misrepresentations to the court concerning the use of corporate assets and the state of corporate affairs; (p) continuing to allow operating losses; (q) allowing constructive loss in shareholder equity; (r) allowing loss in constructive rental income; (s) allowing estimated tax liability from the failure to

---

[1] The Poulnots' Motion for Partial Summary Judgment was granted on July 23, 1993.

reinvest Hurricane Hugo proceeds properly; (t) lack of any business plan for the future of the company; (u) the failure to exercise reasonable corporate business practices, including the failure to hire qualified managers to run and operate the company, from a sales, marketing, and financial standpoint; and (v) the failure to deal in fair terms with outside directors and minority shareholders.

The district court concluded that dissolution was not warranted, but that a court-ordered buyout of the shares was an equitable and appropriate solution to the matter. It therefore ordered such a buyout, and proceeded to the valuation phase of the trial in July 1995. During the first valuation trial, the court heard evidence from the Kreischers as to wrongful conduct by the Poulnots. The court later decided to reopen the record and hold a second valuation trial in September 1996 to address more of the Kreischers' allegations of wrongful conduct. Following the second valuation trial, the court finally concluded that the Kreischers' shares were worth $704,306.31. The Kreischers filed a timely appeal.

DISCUSSION

We review findings of fact by the district court under the clearly erroneous standard. See FED. R. CIV. P. 52(b); United States v. St. Paul Fire & Marine Ins. Co., 86 F.3d 332, 334 (4th Cir. 1996). A finding of fact is clearly erroneous if the reviewing court "on the entire evidence is left with a definite and firm conviction that a mistake has been committed," although there may be evidence in the record supporting the finding. United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). Conclusions of law are reviewed de novo. See St. Paul Fire, 86 F.3d at 334. Since the district court sat in diversity -- the Kreischers are residents of Georgia and Tennessee, while all of the Poulnots and other defendants are residents of South Carolina -- the rule of Erie Railroad Co. v. Thompkins, 304 U.S. 64, 78 (1938), requires the application of the law of South Carolina, the forum state.

I.

First, we must determine whether the district judge should have recused himself. The Kreischers contend that for a number of reasons,

5

he should have recused himself from the bench in the instant case. Among their complaints against him are the following: (1) failure to address briefs on points of law that the Poulnots did not oppose; (2) the "perception that no fact or law could move the court"; (3) the court's conclusion that the Poulnots' conduct was "probably legal," despite the Kreischers' protests; (4) the court's application of the business judgment rule; (5) "harboring a closed mind"; (6) prejudice against their Atlanta counsel; and (7) oppression by delay in issuing its Order.

The standards for determining whether a judge must be disqualified from a matter are set out in 28 U.S.C. § 455 (Supp. 1998). Under the relevant provisions of that statute, a judge must disqualify himself or herself if: (1) his or her "impartiality might reasonably be questioned," id. at (a); or (2) he or she is biased against one of the parties or has personal knowledge of disputed facts. See id. at (b)(1). However, judicial rulings, by themselves, "almost never constitute valid bases for a bias or partiality motion." Liteky v. United States, 510 U.S. 540, 555 (1994). Moreover, "litigants may not make the trial judge into an issue simply because they dislike the court's approach or because they disagree with the ultimate outcome of their case." United States v. Gordon, 61 F.3d 263, 268 (4th Cir. 1995). The Kreischers appear to have alleged that to the extent that the court did not rule in their favor given the facts they presented, the court must be biased.

The Kreischers' argument is unpersuasive. The court ruled against the Kreischers on the issues of fraud, oppression and breach of duty because the Kreischers did not establish any injury to themselves. Since each of those causes of action requires that the plaintiff suffer an injury, the district court's decision was not based on prejudice but on sound legal principles. Moreover, the judge permitted the Kreischers a second opportunity after the initial valuation hearing to present evidence of the Poulnots' fraud. Thus, contrary to the Kreischers' assertions, the judge was open to adjudicating their claims. As a result, grounds 1-5 and seven are without merit.

Moreover, the judge did not appear to be biased against attorneys from Atlanta. While the judge did reference them, ("[B]ut when I see these reams of paper continue to come forward, then I assume the

6

attorney meter is still running in Atlanta"), nothing in the record suggests that the judge harbored any ill feelings toward the attorneys for the Kreischers. When the judge would not allow one of the Atlanta attorneys to argue a portion of the case, he explained that he had "a lot of respect for [the other plaintiff's attorney] and I figured that, through [that attorney], we may be able to get the Plaintiffs' position properly articulated. With that, I'll be glad to hear from Mr. Howard if he has anything to say." The Atlanta attorney (Mr. Howard), then proceeded to make his argument. The judge's reasoning here appears to have less to do with where Mr. Howard is from than it does his opinion of the other lawyer. Thus, the plaintiffs have not demonstrated that the district judge should have recused himself.

II.

The Kreischers contest the district court's application of the law to the facts that it found. The court granted summary judgment to the Poulnots on Claims I-IV of the Complaint, which alleged that the Poulnots: (1) breached the duties of loyalty and care they owed to the corporation as officers, directors, and majority shareholders; (2) oppressed the Kreischers; and (3) defrauded the Kreischers. The district court found that the Kreischers suffered no actionable injury. In contesting the finding that there was no breach of fiduciary duties, the Kreischers contend that the district court misconstrued the standard for examining the breach of the duty of care owed to the corporation. These allegations will be addressed in turn.

South Carolina's statutory law imposes on directors, officers and majority shareholders the duties of loyalty and care, specifically requiring them to act "(1) in good faith; (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) in a manner he reasonably believes to be in the best interests of the corporation and its shareholders." S.C. CODE ANN. § 33-8-300 (Law. Co-op. 1990); S.C. CODE ANN. § 33-8-420(a) (Law. Co-op. 1990) (using the same language to describe officers' duties); Jacobson v. Yaschik, 155 S.E.2d 601, 604-05 (S.C. 1967) (holding that controlling shareholders are also fiduciaries who owe the duties of loyalty and care to the other shareholders).

7

A.

First we must address whether the business judgment rule controls.**2** Although the Kreischers challenge the district court's ruling, the court did not err in applying the business judgment rule. The Kreischers have argued that the business judgment rule has been superseded by South Carolina statutory law, which employs a "reasonably prudent person" standard. South Carolina statutory law explicitly refers to the standard by which a director's behavior is to be judged as the reasonably prudent person under the circumstances. See S.C. CODE ANN. § 33-8-300 (Law. Co-op. 1990). The statute became effective after Dockside (the case that the district court cited) was decided.

The Kreischers have argued that the statute's plain language clearly mandates the use of the reasonably prudent person standard. They bolster their argument by pointing out that we have compared the Model Business Corporations Act, which uses language nearly identical to that in the South Carolina statute, with the business judgment rule and have concluded that the two rules are different. See WLR Foods, Inc. v. Tyson Foods, Inc., 65 F.3d 1172, 1185 (4th Cir. 1995). Thus, the Kreischers have argued, to the extent that the South Carolina statute requires an examination of what the"ordinary prudent person" would do, the business judgment rule cannot apply.

While the statute is silent as to its effect on the business judgment rule, a review of the legislative history of S.C. C ODE ANN. § 33-8-300 reveals that the legislature intended for the courts to decide that question. In the commentary accompanying § 33-8-300, the legislature expressly recognized that the statute could affect the application of the business judgment rule, and specifically left that matter to the courts to determine. See Comment to S.C. C ODE ANN. § 33-8-300. Later in the history, the legislators stated that the business judgment rule is not necessary where the relevant parties have complied with the statute. Id. at n.4. The rule is used appropriately only where the parties have not complied with § 33-8-300. Id. As a result, courts

---

**2** The business judgment rule as applied in South Carolina does not permit the board of directors' decisions to be overturned by judicial action absent proof of bad faith, dishonesty or incompetence. See Dockside Association, Inc. v. Deytens, 362 S.E.2d 874, 876 (S.C. 1987).

8

have continued to apply the business judgment rule. See, e.g., Goddard v. Fairways Dev. Gen. Partnership, 426 S.E.2d 828, 832 (S.C. App. 1993). Since § 33-8-300 does not categorically preclude the application of the business judgment rule, the district court did not err.

B.

Next we address whether the Poulnots breached their fiduciary duties.

1. Hurricane Hugo Insurance Proceeds

The Kreischers have asserted and the district court has concluded that such duties require the fiduciaries to disclose all material information to the shareholders. See Jacobson, 155 S.E.2d at 604-05. The district court found as a fact that the Hurricane Hugo insurance proceeds that the corporation received were material ("Hurricane Hugo was a momentous event in the financial life of s."). Thus, the Kreischers have argued, the willful failure to disclose all information relating to the insurance negotiations violated the duties of loyalty and fair dealing, particularly in light of the Poulnots' offer to exchange the Kreischers' stock.[3]

The district court properly concluded that the Poulnots did not breach the duty of loyalty. Although it found that the Poulnots did not advise the Kreischers of important information in a timely manner, the Kreischers cannot prevail because they were not injured or prejudiced by the Poulnots' failure to share the information.

As the Kreischers concede, they did not actually accept the stock swap offer from the Poulnots. Therefore, the Kreischers still owned the same amount of stock today as they owned before the purchase offer. That fact distinguishes the Kreischers' claims from the cases they cite because the plaintiffs in those cases actually sold their shares or were otherwise prejudiced. See Jacobson, 155 S.E.2d at 603 (stat-

_____

[3] The Poulnots offered to exchange the Kreischers' common stock to nonvoting stock. The exchange would be tax-free, the Kreischers would remain on the board, and would be paid $20,000 per year.

ing that stockholder actually sold the shares); Talbot v. James, 190 S.E.2d 759, 761-63 (S.C. 1972) (noting that the shareholders signed certain agreements to permit the interested director to pursue a mortgage loan).

Moreover, Mr. Kreischer[4] admitted on cross-examination that at the May 10, 1990 board meeting, the board: (1) rejected a $1 million offer from the insurance company and (2) had an estimate of $3.5 million as a proper insurance award.[5] Kreischer was reasonably aware of where the corporation was in the process, because the board discussed the matter at this meeting.

Finally, the Poulnots made their original stock offer in May 1990, before Kerrisons knew what the actual award would be. Although negotiations with the insurance company were ongoing, the final insurance award of more than four million dollars was not made until February 1991. In the interim, a lower amount had been awarded by an arbitrator in November 1990 -- an award that the insurance company contested. By that time, the Kreischers had rejected the stock offer and made a counteroffer of their own. Since the Kreischers did not consummate the transaction with the Poulnots, and in any event, were aware of the potential settlement value, they cannot sustain their breach of loyalty claim.

2. Compensation

The Kreischers also complain that the Poulnots robbed the corporation to the extent that they withdrew funds from the corporation on a number of occasions. The Poulnots contend that the disbursements in question were not loans but compensation for services rendered and expenses reasonably incurred in the course of operating the business. The district court found that the drawing of consultants' fees and other stipends for some of the Poulnots was not a breach of their fidu-

_____

[4] References in the opinion to "Mr. Kreischer" are to Charles Kreischer.
[5] The district court found that during the insurance settlement negotiations, the Poulnots led the Kreischers to believe that the award would be between $2 million and $2.5 million. However, as is shown from Mr. Kreischer's testimony above, it is also clear that the Plaintiffs were aware that higher figures were possible.

10

ciary duties. South Carolina corporate law forbids a corporation to "lend money to or guarantee the obligation of a director" unless the board -- other than the interested director[s] -- approves the loan or the board determines that the loan benefits the corporation and either approves the loan or a "general plan authorizing loans and guarantees." S.C. CODE ANN.§ 33-8-320 (Law. Co-op. 1990). More generally, a conflict of interest transaction in which a director is involved is valid if: (1) the board knows the material facts or a committee of the board approved (or ratified) the transaction; or (2) the shareholders knew the material facts and they by vote approved (or ratified) the transaction; or (3) the transaction is fair to the corporation. See S.C. CODE ANN. § 33-8-310 (Law. Co-op. 1990).

The record provides substantial support for the district court's conclusions. First, some of the Poulnots, such as Jane H. Poulnot, never received any compensation from the company. Much of the other compensation was paid for business advice. Still other "compensation" took the form of commonplace company perquisites, such as the use of company cars, reimbursement for travel, food and lodging, and gasoline and credit cards. None of the compensation appeared to be loans to the Poulnots, and the district court did not find them to be such. The district court did find that although the cars are sometimes used for personal reasons, the defendants pay some of the maintenance expenses of the cars. Moreover, any personal charges to the company gasoline or credit cards were either reimbursed or charged to the Poulnots' personal accounts.

Second, the IRS audited Kerrisons in 1987 and 1988 and found no wrongdoing with respect to the compensation arrangements. In addition, the company has been audited by several accounting firms -- including accountants whom the Kreischers helped select and with whom they have had conversations -- over the past two decades, and no wrongdoing has been uncovered.

Third, the district court found that the Kreischers themselves "also enjoyed certain benefits [at the corporation's expense] on a smaller scale."[6] Although the Poulnots clearly availed themselves of company

_____

[6] For example, Jane and Charles Kreischers' son was employed by Kerrisons while he attended school, and the company paid his automobile insurance and allowed him telephone calling card calls. The Kreischers themselves also availed themselves of the calling card.

11

resources to a greater extent, the Kreischers complaint that any such use of company property is fraudulent is disingenuous in light of their own usage.

Finally, the Kreischers were members of the board of directors who were under the same fiduciary duties as the Poulnots. They also are responsible for ensuring the financial health of the company and investigating matters that concern the corporation. Yet the record suggests that they had knowledge of the practices at issue here, if not the extent,[7] but undertook little or no action until they wanted to exit the company. Based on those facts, the district court did not err in finding that the Poulnots did not breach their fiduciary duties.

C. Fraud And Oppression

The Kreischers also have maintained that the above actions have resulted in fraud and that the stock offer was oppressive. Under South Carolina law, a plaintiff cannot successfully establish fraud without demonstrating that he or she suffered an injury. See First State Savings & Loan v. Phelps, 385 S.E.2d 821, 824 (S.C. 1989) (stating the elements of fraud). Since the Kreischers demonstrated no injury to themselves, there can be no fraud with respect to those issues.

The Kreischers also have contended that the court's findings that: (1) the Poulnots' attitude evinced a desire not to provide an economic return; and (2) the stock exchange plan was "unreasonably low" are evidence of oppression. Moreover, the Kreischers complain that the Poulnots never offered them any exit.

However, the record offers abundant evidence that establishes that there was no oppression. First, Mr. Kreischer admitted that the Poulnots always voted to include the Kreischers on the board, and have never made any effort to remove them from the board. In fact, meeting times were altered to accommodate the Kreischers, who do not live in South Carolina. Second, Mr. Kreischer testified that his relationship with Mr. Edwin Poulnot, Jr. -- who ran the company until his death in 1987 -- was "excellent." Third, the Kreischers' requests

─────────────────────────────────────────────

[7] The district court specifically found that the accountants, in performing their audits, accounted for the practices in question.

12

to review the minutes of meetings had never been refused prior to the instant litigation. Fourth, the Kreischers admit that they never objected to how board meetings were conducted. Finally, the Kreischers also admit that they "normally received" financial statements.

The offer, even if "unreasonably low," does not constitute oppression, either. First, the Kreischers: (1) did not initially feel "squeezed out," (2) felt that the Poulnots had a right to make the offer, and (3) thought that the offer was "interesting." Second, while the proposal would strip the Kreischers of their votes as shareholders, they would have been lifetime members of the board and would retain their voting powers as members of the board. Third, the proposal also guaranteed the Kreischers $20,000 a year. Finally the Kreischers only owned approximately 28% of the outstanding shares. They would always be outvoted anyway to the extent that the Poulnots disagreed with them.

Finally, the Kreischers point to no authority establishing that South Carolina law mandated that the Poulnots offer to buy their shares or otherwise help them out of the corporation. While S.C. CODE ANN. § 33-14-310 permits the court to order a buyout of a shareholder's shares, see id. at (d)(4), the statute says nothing about requiring controlling shareholders to offer a buyout on their own. Thus, on balance, there were sufficient facts for the district court to conclude that there was no oppression.

III.

In an attempt to avoid summary judgment on Counts I-IV, the Kreischers also argue that they may redress injuries to the corporation via their direct suit because Kerrisons is a close corporation. As stated above, the Kreischers did not prove individual damages for their claims of breach of fiduciary duties, fraud and oppression.

As a general matter, suits to recover assets or vindicate other rights of the corporation must be brought as derivative actions, not direct actions. See Johnson v. Baldwin, 69 S.E.2d 585, 588 (S.C. 1952). Shareholders bringing direct suits must establish injuries to themselves as individuals. See Todd v. Aldo, 403 S.E.2d 666, 668 (S.C.

13

App. 1991) (stating that an individual shareholder may bring suit only when his "loss [is] personal and not a loss of the corporation").

Some courts have recognized that where there is a close corporation, a derivative action is not necessary. See Dresden v. Willock, 518 F.2d 281, 288 (3d Cir. 1975); Watson v. Button , 235 F.2d 235, 237 (9th Cir. 1935) (applying Oregon law); Thomas v. Dickson, 301 S.E.2d 49, 51 (Ga. 1983). The Kreischers argue that South Carolina has also adopted the rule.

However, when the issue was raised before the South Carolina Supreme Court, the court "recognized that there has been an evolution in the concept of minority rights," but did not formally adopt those principles. Davis v. Hamm, 387 S.E.2d 678, 680 (S.C. Ct. App. 1989). The court noted that cases advocating direct suits for shareholders in close corporations treated the parties like "joint venturers or partners." Id.; see, e.g., Dresden, 518 F.2d at 288. Moreover, the court noted that in Watson, the circuit court acknowledged that, among other things, the parties had agreed to be jointly responsible for the corporations' debts and the new owners of the corporation waived any right to bring a corporate cause of action against the malfeasant shareholder. See Davis, 387 S.E.2d at 679 (citing Watson, 235 F.2d at 237).

In a later case, the South Carolina Court of Appeals distinguished the Dickson case from the case before it after assuming (but not deciding) for the purposes of that case that those principles applied. See Babb v. Rothrock, 401 S.E.2d 418, 419-20 (S.C. 1991). Therefore, South Carolina's courts have not expressly adopted the policy of allowing minority shareholders in close corporations to bring direct suits and we decline to do so here.

As a result, we conclude that there can be no liability unless the duties breached flowed to the plaintiff, "such as in the types of suits typified in Jacobson v. Yaschik [citation omitted] and in actions brought by minority stockholders pursuant to . . . Sections 33-14-300 to 33-14-330." See Davis, 387 S.E.2d at 680. As stated above, the Kreischers cannot avail themselves of the Jacobson rule because there was no transfer of shares or other transaction. Their claims under §§ 33-14-300 to 33-14-330 were permitted to go forward, and resulted in a court-ordered buyout pursuant to S.C. CODE ANN. § 33-

14

14-310 (d)(4) (Law. Co-op. 1990). Thus, as to claims I-IV of the Complaint, summary judgment was appropriate.

IV.

Next we must find whether the court granted appropriate relief to the Kreischers.

A. Substantive Relief Granted

The district court found that no breach of fiduciary duties, fraud, oppression occurred. It therefore declined to order judicial dissolution pursuant to § 33-14-300. However, it did order the Poulnots to buy out the Kreischers' shares, pursuant to § 33-14-310 (d)(4).

Section § 33-14-310, which provides the procedural requirements for judicial dissolution, also provides for buyouts and other relief where the conduct at issue does not warrant dissolution, but does require an equitable solution terminating the parties' relationship. See S.C. CODE ANN. § 33-14-310 (d)(4). In light of the court's findings -- no fraud, oppression or breach of duty -- the relief is appropriate. See S.C. CODE ANN. § 33-14-300(2)(ii) (stating that the court may dissolve a corporation in a shareholder action "if it is established that" the directors have acted fraudulently, breached fiduciary duties or oppressed the other shareholders). A buyout achieves both the Kreis-chers' goal of exiting the company and the Poulnots' goal of continu-ing the business. See Hendley v. Lee, 676 F. Supp. 1317, 1327 (D.S.C. 1987) (ordering a buyout of a shareholder's shares where the court found that the defendant shareholder had not acted wrongfully). As a result, the relief granted will not be disturbed.

B. Attorneys' Fees

The Kreischers' motion for the awarding of attorneys' fees was properly denied. The district court determined that the request for attorneys fees was not ripe, because the judgment ordering a buyout had not been affirmed on appeal. Under DIST. CT. R. 54.02, the local rule in South Carolina's federal district courts governing attorneys' fees, a motion for fees is timely if filed within thirty (30) days of the

15

entry of the final judgment of the district court or when that judgment is affirmed on appeal. However, the rule states that it applies "[e]xcept as otherwise provided by statute or order of the [c]ourt." In the instant case, the district court declined to consider the Kreischers' motion until judgment for them had been affirmed on appeal. As the rule permits the district court to refuse to consider the Kreischers' motion when it was raised, its decision will not be disturbed.

V.

Next we must address whether the district court's valuation of Kerrisons was clearly erroneous. The Kreischers contend that the proper date for valuation is January 31, 1991, and that the court erred in not using this date. They also contend that they are entitled to $3,512,979.48 rather than the $704,306.31 value that the court placed on their shares. The Poulnots also appeal the valuation, claiming that the court erred in failing to apply minority discounts and failing to dispose of the ten shares owned by Edwin Poulnot II at his death. As the court had a substantial basis to conclude as it did, its findings as to the valuation date and value should remain undisturbed. However, it should have ordered the purchase of the remaining ten shares.

A. Valuation Date

The Kreischers have challenged the date of valuation selected by the district court, which was May 1, 1995 (the date of its Order). The Kreischers argue that January 31, 1991 was the appropriate date of valuation,[8] because that date: (1) was close to the period when the Kreischers first objected to the Poulnots' activities; (2) was close to when the Kreischers filed their complaint (October 28, 1991); (3) was midway between 1986 -- when the losses first began-- and 1995; (4) was in harmony with the 1988 and 1990 appraisals; and (5) was before the Poulnots spent much of the corporate funds on their legal fees.

_____

[8] There appears to be a bit of confusion on this point. The Kreischers assert in their brief that January 31, 1991 is the appropriate date of valuation, but at various times in the proceedings below they assert both January 31 and October 31, 1991.

While January 31, 1991 or October 31, 1991 would have been an appropriate date, the court's selection of May 1, 1995 was not clear error. The Kreischers do not cite any authority (nor have we found any) that would require that, in the absence of fraud or oppression, the date closest to the date on which the conduct was first complained of be set as the date of valuation. As it did not find fraud or oppression, the district court considered several dates, noting that the authority in those types of cases is scant.

Finally, it looked to Hendley, 676 F. Supp. at 1327, for guidance.[9] In Hendley, the parties sought judicial dissolution of a South Carolina corporation because the board was at an impasse and saw no hope for resolution.[10] After deciding that a forced buyout, not dissolution, was the appropriate relief, the court was faced with valuation issues. Id. at 1326-27. It reasoned that in dissenters' rights cases, the date of ouster is the appropriate date for valuation. Id. at 1327. However, since there was no ouster in that case, it selected the date of the hearing as the fairest date for all parties. Id.

The district court in the instant case followed that reasoning and reached the same result, a result we find acceptable here. The district court concluded that it would look to "what is fair between the parties." As stated above, the court found that there were no fraudulent or oppressive events that mandated that it select a particular date. Since any date would be inherently unfair to one of the parties, it reasoned, the most equitable date was May 1, 1995, the date of its Order.

The Kreischers' argument is unpersuasive. At bottom, their argument is premised upon findings of fraud and oppression and other wrongful conduct that would essentially entitle them to dissenters'

_____

[9] We recognize that the corporation at issue in Hendley was still profitable at the time of litigation while Kerrisons was losing money. However, in light of the district court's findings as to the Poulnots' alleged misbehavior and the Poulnots' desire to continue the business, Hendley is sufficiently analogous to provide support for the district court's decision.

[10] The district court in Hendley notes that the parties shifted positions several times, alternatively requesting dissolution or a forced buyout by the other party.

17

rights. However, the Poulnots' conduct, although distasteful, did not rise to that level. As stated above, we affirm the findings of the district court as to those issues. Moreover, equity requires fairness to the Poulnots, although it is their conduct of which the Kreischers complain. Finally, the date selected is consistent with the reasoning of other courts in this circuit addressing a similar issue. Therefore, the district court's selection of May 1, 1995 as the valuation date in the instant case was not clear error.

B. Valuation Amount

The Kreischers challenge the approximately $704,000 valuation of their interest, a figure the district court reached after two valuation trials. In determining the fair value of stock, the court should consider, where applicable, the market value and investment value of the stock and the net asset value of the corporation. See Morrow v. Martschink, 922 F. Supp. 1093, 1103 (D.S.C. 1995) (citations omitted). Specifically, the Kreischers claim that in computing the net asset value of the corporation, the court erred in failing to consider certain factors, such as $1.76 million in Hurricane Hugo insurance proceeds and offers to purchase or lease corporation-owned property.[11] They claim that the failure to include these items is clear error.

After the two valuation hearings, the district court concluded that the company's book value was $2,518,703, based on the appraisal of a CPA, Francis Humphries. Although the Kreischers also introduced expert testimony (Dr. Oliver Wood, an economist, appraised Kerrisons value at $2,715,477), the court found that appraisal less comprehensive because the appraiser had not adjusted the valuation amount for tax liability. Based on Mr. Humphries' appraisal, the Kreischers, who own 27.9% of the shares of stock, were entitled to $704,306.31.

The district court's findings as to the value of the company were not clearly erroneous. The court reviewed the parties' submissions on the value of Kerrisons' real estate holdings, and then the company's overall book value. The parties' real estate appraisers disagreed on the

_____

[11] The property in question is the property located at 260 King Street in Charleston, South Carolina.

18

value of the property on 260 King Street in Charleston.**12** The Kreischers' expert, Frank Batten, found that 260 King Street was worth $2,998,149. The Kreischers further contend that there are several offers that indicate certain prospective buyers' willingness to pay even higher amounts. By contrast, the Poulnots' appraiser, Stephen Attaway, valued 260 King Street at $1,850,000.**13**

However, the court did not err in accepting Mr. Attaway's appraisal over Mr. Batten's. Mr. Batten is not an appraiser, but a realtor.**14** Moreover, Mr. Batten never even inspected the inside of the property. By contrast, the Poulnots' appraiser, Stephen Attaway, is an MAI appraiser who inspected the entire building. Given that the appraisal the court accepted was performed by a professional who used appropriate methods of valuation while the rejected appraisal was not performed by a professional -- who in any event did not evaluate the entire building -- the court's acceptance of the $1,850,000 for the value of 260 King Street was not clear error. As the value of the 260 King Street property was the only real estate appraisal challenged by the Kreischers, the other values stand and the district court's acceptance of the overall real estate value as $3.8 million will not be disturbed.

_____

**12** The Kreischers also had an MAI appraiser, Charles Middleton, value the property. He appraised the property at $3.3 million, which is higher than both the Kreischers' other expert and the Poulnots' MAI appraiser. However, the Kreischers' attorney stated that Mr. Middleton's testimony was offered to establish that one of the proposals offered to Kerrisons should not be accepted, not the valuation of the property. Therefore, the Poulnots did not cross-examine Mr. Middleton as to his valuation. As a result, the district court did not consider Middleton's appraisal. As the Kreischers indicated that Mr. Middleton's testimony was not being offered to prove value, we will not consider his appraisal, either.

**13** Mr. Attaway used three approaches in valuing the property, which were: the cost approach (resulting in a value of $1,750,000); the market approach (resulting in a value of $1,860,000); and the income approach (resulting in a value of $1,780,000). He relied mostly on the market approach.

**14** Batten testified that he had done appraisals before, but that he was not and never has been a licensed appraiser.

19

Moreover, the court's acceptance of the Poulnots' expert's appraisal of the overall book value is also not clear error. The district court relied on the appraisal of the Poulnots' expert regarding the overall book value, because he considered the tax liabilities. See Santee Oil Co., Inc. v. Cox, 217 S.E.2d 789, 792 (S.C. 1975) (listing taxation issues among the appropriate factors to consider during the valuation of a company). After accounting for the appropriate tax adjustments and losses the company suffered, Ms. Humphries concluded that the book value was slightly more than $2.5 million. As there is sufficient support in the law and the record for that evaluation, the finding will not be disturbed.

The Kreischers also contend that some of the Hurricane Hugo proceeds were not calculated into the appraisal. However, they are basing their appraisal on the value as of January 31, 1991, the date that they urge should be used for valuation purposes. As stated above, May 1, 1995 is the date of valuation, not January 31, 1991. As the Hurricane Hugo proceeds were paid in February, 1991 -- which is, of course, after the date selected by the Kreischers -- the Kreischers' argument fails because the additional money could not have been accounted for before the final award was known and in any event, there are no facts suggesting that the proceeds had not since been included for the purposes of the May 1, 1995 valuation date.

Finally, the Kreischers argue that the valuation did not properly reflect the true value of the company because various offers to purchase or lease Kerrisons' properties were not considered. That argument is not tenable. One of the offers upon which the Kreischers rely in their argument was an offer by Mr. Michael Bisciotti, to either lease or purchase Kerrisons' property, including the 260 King Street property.[15] That offer was the second such offer by Bisciotti. The first offer, which was significantly lower, essentially was considered fraudulent by the Kreischers. The Kreischers wanted the district court to consider his next offer, which was several million dollars higher, because the Poulnots indicated some willingness to accept it. However, as the Kreischers admit, the second offer by Bisciotti is "substantially higher than any appraisal," including their own. Moreover,

_____

[15] Some of Bisciotti's proposals included lease arrangements, but he apparently was also interested in purchasing the property outright.

20

Bisciotti's proposal was to lease the property over a twelve-year period. Therefore, inclusion of the full contract value of the lease to Kerrisons for the purposes of valuation would be inappropriate.[16] Several of the other offers that the Kreischers contend should be used are also lease arrangements and are above the value as appraised by both the Poulnots' and the Kreischers' experts. Like Bisciotti's offer, there were no appraisals. In light of those facts, the district court's decision to accept the appraisal of the only MAI appraiser was appropriate.

## C. Minority Discounts

The Poulnots have claimed that the court erred in failing to apply minority discounts in valuing the Kreischers' shares. As the district court noted, there is support for granting minority discounts when there is a sale of the stock of close corporations. See, e.g., South Carolina Nat'l v. McLeod, 256 F. Supp. 913, 928 (D.S.C. 1966). Such discounts are considered appropriate because there generally is no ready market for the shares and it is unlikely that the minority shareholder will ever be able to obtain sufficient stock to control the company. See id. However, the district court reasoned that the instant case was more analogous to dissenters' rights cases, where such discounts are not awarded because such an award would reward the majority stockholders for their wrongful conduct. Id.

The Poulnots contend that they are entitled to the discounts because the district court found that they did not commit fraud, breach any fiduciary duties or oppress the Kreischers, and that the relief the Kreischers requested (dissolution) was not warranted. Moreover, they argue, Morrow v. Martschink, 922 F. Supp. 1093 (D.S.C. 1995), upon which the district court relied, is distinguishable because: (1) the parties in that case wanted the plaintiffs out while the Poulnots fought the buyout in the instant case; (2) the Morrow court had not made a finding one way or the other as to fraudulent or oppressive conduct, while the district court in the instant case made a finding that no such

_____

[16] Bisciotti did not actually compute, nor is there evidence that anyone computed, the discounted present value. He did opine that the discounted value of his offer would be at least $6.5 million, but that figure is speculative.

21

conduct occurred; and (3) there was no majority shareholder in Morrow, while there is one (Edwin Poulnot III) here.

While we recognize those differences between Morrow and the instant case, the Poulnots' argument fails nevertheless. First, there is authority supporting the proposition that discounts are not appropriate in forced buy-out cases. See Hendley, 676 F. Supp. at 1330 (stating that although discounts are appropriate where the parties are willing participants in the sale, they are not appropriate where the sale is not voluntary and "the transaction is between insiders") (citation omitted). Second, as the Morrow court stated in that case, families who run businesses often do not desire outside ownership interests in those businesses. See id. at 1105 (citation omitted). Therefore, the rationale behind discounts -- the lack of marketability-- is inapplicable when the transfer results in ownership by one family because it is that absence of marketability that makes the shares valuable to the family. Id.

Finally, the Poulnots' claim of complete innocence in light of the district court's findings is misleading. They correctly assert that the district court concluded that no fraud, oppression or breach of duty occurred. However, the district court concluded that no fraud or oppression occurred because the Kreischers could not prove injury or prejudice, not necessarily because the Poulnots behaved properly. The court noted that the Poulnots failed to share material information relating to the insurance proceeds, found the Poulnots' actions suspicious, and the Kreischers suffered a "wrong." While the conduct did not warrant judicial dissolution, it did warrant the less drastic measure of a forced buy-out of the Kreischers' shares at fair market value. As a result, it was not clear error to fail to apply discounts.

D. The 10 shares owned by Edwin Poulnot, III

The Poulnots claim that the court failed to dispose of the ten shares owned by Edwin Poulnot at his death. The court found that the 10 shares remained in the estate, a fact that the Kreischers concede. Later, the district court recognized that it had not disposed of the shares, that the Kreischers were entitled to the benefit of them under Edwin Poulnot, III's will and contemplated ordering the corporation to purchase them along with the other shares.

22

To the extent that the court did not dispose of the shares, it erred. Under S.C. CODE ANN. § 33-14-310, the court may in its discretion order the corporation to purchase the shares of a shareholder. See id. at (d)(4). In the instant case, the district court exercised that discretion to order the purchase of the Kreischers' shares by the corporation. However, its failure to order the purchase of all of the shares defeats entirely the purpose of the relief already granted to the Kreischers -- a complete exit from the company. Failure to order the sale of the remaining shares forces the parties to relitigate matters that have already been litigated at considerable expense of time and resources in the district court. The district court acknowledged that it "made a mistake" by failing to include the stock, but took no action to complete the Kreischers' exit from the company. Thus, ordering the sale of the beneficial interest by the Kreischers to the company is appropriate. The district court should therefore order the company to purchase the remaining shares beneficially owned by the Kreischers.

CONCLUSION

In conclusion, we affirm the district court's orders of May 1, 1995 and January 29, 1997, as to the Poulnots' liability, the relief granted, and the value placed on the company. We remand the cause to the district court to order the purchase of the remaining ten shares beneficially owned by the Kreischers.

AFFIRMED IN PART AND REMANDED WITH INSTRUCTIONS

23